[Civ. No. 15398. First Dist., Div. One. Sept. 29, 1953.]

HARRY E. FOSTER, Respondent, v. A. G. KEATING, Appellant.

436

John A. Sinclair and Dan L. Garrett, Jr., for Appellant.

Morris Lowenthal, Juliet Lowenthal and Karl D. Lyon for Respondent.

WOOD (Fred B.), J.—The defendant, A. G. Keating, has appealed from a judgment which awards the plaintiff, Harry E. Foster, $31,440 as compensatory or general damages and $9,500 as exemplary damages.

The judgment is based upon findings of fact which may be summarized as follows:

I. Commencing November, 1949, plaintiff owned a lumber yard and planing mill at Fulton, owned and conducted a sawmill business as sublessee of a sawmill near Cazadero, California, and had a timber contract relative to timber on the sawmill property. By the middle of April, 1950, he had invested more than $8,000 in the mill and yard, in addition to personal labor contributed by him.

II. Commencing in May, 1950, and continuing until this action was filed, defendant deliberately and in bad faith conceived, formulated and continuously engaged in a course of conduct, secretive and otherwise, for the purpose of acquiring and appropriating to himself all of the business and assets of plaintiff and of eliminating plaintiff therefrom, committing the following acts of misconduct, among others, against plaintiff:

(1) From about May 1, to June 2, 1950, he importuned

plaintiff to become associated with him in a joint venture for the conduct and expansion of said business; then and subsequently representing that he had formerly been a major-general in the army and had wide experience as head of the Mining Division of the War Production Board during the recent world war, had very substantial wealth and a high credit rating which he was willing to employ for the benefit of plaintiff's business and would finance, remodel and expand the business so it could pile up logs for winter and permit year round operation; that if plaintiff would agree to enter into a joint venture with him for said purpose, he would pay all the then outstanding debts of the business and all future liabilities of the joint venture and invest $10,000 immediately for that purpose and for supplying additional capital; that within 60 days after entering into such venture, he would form a corporation for the operation of the business, that until formation of the corporation plaintiff would manage production and receive $350 per month while defendant would handle sales and plaintiff would additionally receive 5 per cent of the gross amount of the sales of the processed lumber; that upon formation of the corporation plaintiff would continue to receive $350 per month as production manager and a 35 per cent interest in the corporate stock, defendant to receive 65 per cent of the stock, and defendant would lend the corporation all necessary capital.

(2) Plaintiff believed all said representations and, relying upon them, agreed June 2, 1950, to enter into a joint venture for the conduct of said business. The agreement was made upon said terms and conditions, representations and promises and, in entering into the agreement, defendant agreed to carry out all of said representations and promises, to cooperate fully with plaintiff and exercise his best efforts, knowledge and experience and supply necessary funds and credits during the development and expansion of the business for their mutual benefit. It was further agreed that the business would be conducted under the name "Fulton Lumber Yard" and that all proceeds from sales would be collected by defendant and deposited in the Fulton Lumber Yard account in Exchange Bank at Santa Rosa.

(3) Said representations were false and fraudulent. At no time did defendant intend to carry them out; instead, he made them for the sole purpose ultimately to appropriate said business and assets for himself and to the exclusion of plain-

tiff, under the guise of a joint venture agreement designed by him to induce plaintiff to turn full control of the business over to defendant. As a part of said scheme defendant induced plaintiff June 2, 1950, to execute and deliver to defendant a written agreement and power of attorney, but both documents were prepared and designed by defendant as a part of said scheme, with no intent to assume any of the obligations expressly or impliedly contained in the written agreement.

(4) Commencing in the middle of May, 1950, defendant undertook the management and operation of the business, made all sales, took all proceeds of sales and also the proceeds of plaintiff's accounts receivable collected by defendant, such proceeds exceeding $30,000, and deposited them in his personal bank accounts in San Francisco and Oakland, instead of in the Fulton Lumber Yard account in Santa Rosa. From those proceeds he paid but a portion of the obligations of the business and failed to pay the rental on the sawmill which accrued between November, 1949, and June, 1950, also all bills incurred by defendant after June 1, 1950, totaling at least $5,000. He sold the lumber of the business under the name of "Port Lumber Company" and incurred obligations in the operation of the business under the name "Fulton Lumber Yard," so they would appear to be solely the obligations of plaintiff. At all times until shortly before filing this action, plaintiff believed defendant had carried out his said promises and agreements and had paid said bills and liabilities.

(5) In June, 1950, defendant, unknown to plaintiff, seized all plaintiff's documents concerning the mill and yard, including the sublease of the mill, the joint venture agreement and power of attorney, a logging contract with one Gould, and documents in connection with the use of a tractor, documents necessary to enable plaintiff to establish his rights and interests in the business. He withheld the same to preclude plaintiff from asserting and proving his rights and interests and to prejudice plaintiff's financial position. Defendant intentionally kept all records of the business under his supervision and management, placing therein only the data he felt necessary to paint the picture in a light most favorable to him, making up the records and confusing the operations with records pertaining to activities of his own business and to make it impossible for plaintiff or anyone else to detect the true facts.

(6) Defendant failed to pay any money into said business (by way of investment or otherwise), for the purpose of

creating a false impression in the minds of creditors, customers and others that plaintiff was "broke"; falsely representing to creditors of plaintiff and of the business that the bills and obligations which defendant had agreed to pay were the sole liability of plaintiff, that plaintiff was without assets, was irresponsible and "broke," and that they should do business solely with defendant since he had superior assets and financial responsibility. He conducted the business in an inefficient manner, to prevent it from being as successful and profitable as it would have been without his influence and management, and to discourage plaintiff and deprive plaintiff of the fruits of the business, while plaintiff was doing all in his power to procure logs and carry on production.

(7) In August, 1950, defendant gradually engaged in a more direct course of conduct intended to eliminate plaintiff from all activity in the business, gradually excluding plaintiff from all its affairs, withholding information and excluding plaintiff from access to the books, records and office of the business. August 28, 1950, defendant represented to plaintiff that by reason of claims of creditors of plaintiff's lessor of the sawmill site, defendant's investment in the business (which investment he had not made) and his other resources might be jeopardized, and to avoid such, it was necessary to cancel as of July, 1950, the June agreement and power of attorney on the face thereof but without terminating the relationship between plaintiff and defendant, and assured plaintiff he would fully perform the promises made by defendant at the time of entering into said arrangement. Plaintiff, believing and relying upon said representations, cancelled said June, 1950, documents and did not discover the falsity of said representations until shortly before the filing of this action. At the time of said cancellation, defendant had no intention of continuing in any joint venture with plaintiff. He sought merely to obtain such documents back from plaintiff and thus enable defendant to claim that the joint venture, supposedly in existence, had been mutually terminated and that defendant was free to appropriate the assets thereof. Defendant also informed plaintiff that further to prevent such jeopardy of defendant's investment it was necessary that defendant procure new documents granting the supposed joint venture a new lease on the mill and the right to purchase machinery and equipment there, to be executed in defendant's name alone but to be held for the joint and mutual benefit of plaintiff

and defendant. Thereupon defendant obtained such documents in his own name, telling plaintiff he had obtained them and would hold them for their mutual benefit as part of the joint venture. At no time did he intend to so hold them; instead, he intended to hold them solely for his own benefit. Plaintiff believed and relied upon such representations until shortly before filing this action, at which time defendant was asserting that plaintiff had no interest in said documents.

(8) Defendant converted to his own use and benefit all of the logs, lumber, and gasoline at the mill and yard, the equipment and assets at the mill, the leases, timber and logging contracts, money and proceeds of the business. He failed to pay and make returns on sales and withholding taxes and permitted the unemployment insurance policy to lapse. Twice after the filing of this action defendant purported to sell the business, receiving $1,000 on one sale and making a second agreement of sale, presently in effect, which calls for the payment to defendant of $7,000, in addition to the assumption of defendant's obligation to pay the lessor $7,000.

III. By reason of said acts and misconduct plaintiff was deprived and stripped of his principal assets: his investment in the sawmill, his lease of the sawmill and the right to purchase equipment and machinery thereat, the proceeds of sales of the business, the logging contracts, and all other assets of the business, to his damage in the sum of $31,440.

IV. In doing all of the foregoing acts of misconduct, defendant acted maliciously and with the purpose of preying on small businesses such as plaintiff's and to injure, damage and destroy plaintiff in his business, his good name and reputation. Defendant carried out said intent and purpose of appropriating plaintiff's assets and business through the flagrant, aggravated, wanton and reckless abuse of the confidence reposed in him by plaintiff and through the use of artifice, trickery, deceit, misrepresentation, falsehoods, coercion, and gross oppression. Defendant's misconduct toward plaintiff was not an isolated transaction but was connected with and was the precise design and pattern used by defendant during March, April, and May, 1950, in stripping one Edward Bell of Bell's Lumber Yard at Oakland. In the Foster and Bell transactions, defendant's object was first to "acquire," without risk or expense a retail outlet for lumber (Bell's Lumber Yard had been the sole outlet for plaintiff's mill) and then to acquire the primary source of lumber supply for the yard (plaintiff's mill, business, and assets) by taking

advantage of the need of Bell and plaintiff for working capital and worming himself into their confidence. Defendant succeeded in said object by misrepresentation, falsehoods, trickery and, deceit, and in a cold, calculating, ruthless manner stripped plaintiff and Bell of all their profit. Wherefore, plaintiff is entitled to $9,500 as exemplary damages.

V. At all times plaintiff devoted his entire time, efforts, knowledge, and experience to the business and performed all conditions and promises on his part and at no time breached any of his promises or obligations.

*From the facts found, the court drew these conclusions of law*: (a) defendant became trustee for plaintiff in respect to all of plaintiff's property, business and assets; (b) as such trustee he was obligated to hold and conduct the same for the sole benefit of plaintiff and was precluded from profiting therefrom to his own advantage; (c) in view of the violation and breach of defendant's trust, confidential and fiduciary duty to plaintiff, plaintiff is entitled to recovery against defendant for the value of all property and assets and proceeds appropriated and converted by .defendant, together with all other damages and losses sustained by plaintiff as a result of defendant's misconduct, including losses and damages sustained by reason of defendant's failure to pay the obligations and liabilities of plaintiff's business and his conversion and appropriation of plaintiff's property and assets and the proceeds of plaintiff's business, including the value of all expenditures and investments of plaintiff in the property; (d) plaintiff is entitled to judgment for $31,440 as compensatory or general damages and $9,500 as exemplary damages.

*In support of his appeal defendant claims*: (1) Evidence of conversations between the parties prior to the execution of the written agreement of June 2, 1950, was admitted in violation of the parol evidence rule; (2) plaintiff was allowed to file an amended complaint setting up a new or different cause of action, based upon evidence erroneously admitted; (3) the court prevented defendant from proving his defense; (4) the finding that a joint venture existed is not supported by the evidence; (5) the court erroneously failed to find.that the agreement of June 2, 1950, was later cancelled; (6) the award of $31,440 compensatory damages is erroneous because not itemized in the findings and not supported by the evidence; and (7) the award of exemplary damages is erroneous because the asserted breach was of obligations arising out of a contract.

(1) *The admission of evidence of conversations which occurred prior to execution of the written agreement and* (2) *the permission to file an amended complaint are closely interrelated and will be considered together.*

The case was tried upon an amended complaint. When the evidence was in and counsel had orally argued the case, the court announced its decision. Thereafter and before findings of fact had been prepared and filed plaintiff moved for and was granted leave to file a second amended complaint, to conform to proof.

The facts alleged in the second amended complaint were substantially the same in all respects as the facts found by the court.

■ The second amended complaint did not set up a new or different cause of action. It followed, in large part, the allegations of the first cause of action* stated in the first amended complaint, which also sounded in tort, the fraudulent misappropriation and conversion of plaintiff's business, properties and assets, in violation of trust and of a confidential and fiduciary relationship.

The second amended complaint was essentially the same as the first count of the first amended complaint save that it alleged that defendant conceived and entered upon the accomplishment of his plan of misappropriation and conversion in May of 1950, orally inducing plaintiff to enter a joint venture, preparing and inducing plaintiff to sign a written agreement (which omitted various of the oral stipulations and included provisions inconsistent with the oral).

The first count of the earlier complaint, instead, laid the plot as commencing early in June, "at or about the inception of the joint venture." But from that point on, chronologically, the first count alleged essentially the same facts as did the final complaint; e.g., the facts narrated in paragraphs 4, 5, 6 (except the last sentence of 6), 7 and 8 (except defendant's two sales of the business, which occurred after the filing of the action) of paragraph II of our summary of the findings

---

*The second, third and fourth causes of action of the first amended complaint (omitted from the second amended complaint) were respectively, (1) to impress a trust, for the mutual benefit of plaintiff and defendant, upon the assets allegedly held in trust by the defendant for the benefit of the joint venture; (2) to enjoin alleged threatened continuance of acts allegedly injurious to plaintiff and the joint venture business; (3) to recover damages for alleged violations of the joint venture agreement and refusal of defendant to make an accounting to plaintiff of the transactions of the joint venture business.

of fact, and in paragraphs III and IV (except the Keating-Bell transactions) of the summary, with but minor differences in the specification of the details of the alleged transactions.

The first count alleged the facts recited in paragraph 1 of paragraph II of our summary without characterizing defendant's promises and representations as fraudulently made. It alleged the provisions of the joint venture agreement in the terms of those promises and representations, adding that in May of 1950, a written agreement "purportedly" containing those promises was,executed by the parties effective June 1st, but that plaintiff's only copy thereof was subsequently taken by defendant, without plaintiff's consent, and remained in the possession of defendant, who refused to return it. The first count also alleged that at the time of the first association of the parties in the joint venture, and continuously thereafter, each owed to the other "undivided and highest loyalty and utmost good faith, and occupied a fiduciary, confidential and trust relationship to each other."

The conclusion is irresistible that the second amended complaint was not founded upon a new or different cause of action than that stated in the first amended complaint.

The first complaint sounded in fraud and sought damages for wrongful conversion of a joint venture business in gross violation of the ,fiduciary relationship. That was a cause of action comparable to that in *Elsbach* v. *Mulligan*, 58 Cal.App. 2d 354 [136 P.2d 651], recovery of damages against a co-adventurer for fraudulently inducing certain agencies to terminate their contracts with a corporation organized to carry out the joint venture agreement. (See, also, *Sime* v. *Malouf*, 95 Cal.App.2d 82, 94-101 [212 P.2d 946, 213 P.2d 788].) ▪ When parties become joint venturers they acquire rights and subject themselves to duties growing out of the fiduciary relationship which they have thus created. (*Pacific Atlantic Wine, Inc* v. *Duccini*, 111 Cal.App.2d 957, 965-966 [245 P.2d 622].) ▪ An action in fraud for damages may lie even if the relationship is not confidential or fiduciary in the strict legal sense of that term. It has been extended "to every possible case in which a fiduciary relationship exists as a fact. Such relation need not be legal; it may be moral, social, domestic or merely personal." (*Bank of America* v. *Sanchez*, 3 Cal.App.2d 238, 243 [38 P.2d 787].)

The second complaint likewise sounded in fraud. It sought damages for wrongful conversion of plaintiff's business in

gross violation of a confidential and fiduciary relationship. It dealt with the very same series of transactions as did the first complaint. It differed merely in advancing the date of inception of the plot and in characterizing the joint venture agreement as one of the steps taken and devices used by the defendant in accomplishing his plan to misappropriate and convert plaintiff's business and assets to his own use.

Nor was defendant misled concerning the issues of fraud presented by the first count of the first amended complaint. He had joined issue by his answer, and plaintiff's counsel, at the very beginning of the trial, made it clear that he was trying the case on the theory of conversion of the business in violation of a fiduciary relationship, citing *Elsbach* v. *Mulligan, supra,* 58 Cal.App.2d 354, as a leading case of this type. In a discussion which developed during the examination of the first witness, plaintiff's counsel said, "The evidence will show that even before the contract was drawn, there was that [fiduciary] relationship." And defendant met those issues fully, through cross-examination and by his own witnesses.

Ample precedent for allowing amendments to conform to proof, in such a case, is furnished by *Klopstock* v. *Superior Court,* 17 Cal.2d 13, 19-23 [108 P.2d 906, 135 A.L.R. 318]; *Valencia* v. *Shell Oil Co.,* 23 Cal.2d 840, 848-849 [147 P.2d 558]; *Hayes* v. *Richfield Oil Corp.,* 38 Cal.2d 375, 382 [240 P.2d 580]; *Carman* v. *Athearn,* 77 Cal.App.2d 585, 594-595 [175 P.2d 926].

But, says the defendant, plaintiff's shift of position from the first to the second amended complaint was based upon evidence erroneously introduced in violation of the parol evidence rule, evidence of the conversations of the parties prior to the signing of the written agreement. That is not correct. The trial judge expressly stated he was not admitting that testimony to vary the terms of the writing.

That testimony was relevant to the issue of the creation and existence or nonexistence of a confidential and fiduciary relationship between the parties. We find nothing in the written agreement that would preclude the use of extrinsic evidence to show that it represented a joint venture. By its terms defendant agreed to form a corporation and plaintiff agreed to convey his business to the corporation; defendant to supply the corporation with cash capital of not less than $5,000; the stock of the corporation to issue 65 per cent to defendant and 35 per cent to plaintiff; pending incorporation,

defendant to advance such sums as he deemed necessary to finance plaintiff's operations and to have the right to purchase the entire output at cost plus 5 per cent of his resale prices; plaintiff to give defendant a general power of attorney to collect all moneys then or thereafter owing to plaintiff and to operate the business in all respects; plaintiff to devote his entire time to the business and receive $300 a month out of income. It is not uncommon for coadventurers to form a corporation for the conduct of their operations. ▇ A joint venture may be formed by parol or it may be inferred from the acts and declarations of the parties. (*Nelson* v. *Abraham,* 29 Cal.2d 745, 749, 752-754 [177 P.2d 931]. See, also, *Fitzgerald* v. *Provines,* 102 Cal.App.2d 529, 536 [227 P.2d 860]; and *Milton Kauffman, Inc.* v. *Superior Court,* 94 Cal.App.2d 8, 17 [210 P.2d 88].)

▇ Evidence of those conversations was also relevant to the issue framed by the allegations of the first complaint, and the denials of the answer, to the effect that defendant induced in plaintiff complete and trusting personal confidence in defendant's every word and deed. That, if proved, would furnish a basis for an inference of a personal confidential relationship which would impose duties upon defendant comparable to those which inhere in a fiduciary relationship in the strict legal sense of the term.

▇ The evidence of the falsity of some of defendant's representations, the evidence that he made promises which he never intended to keep, and the evidence of defendant's misappropriation of the Bell Lumber Yard business by strikingly similar methods, bore upon the character and quality of defendant's conduct (his intent to convert plaintiff's business to his own sole use and benefit) commencing at or about the time of the signing of the written agreement and continuing until suit filed.

That evidence, properly admitted, supports the inference that defendant conceived his plan of misappropriation early in their dealings instead of the time of signing the agreement.

We conclude that the evidence was properly admitted and the amendment was properly allowed.

(3) *Was defendant prevented from presenting his defense?*

Defendant claims that he was prevented from fully presenting his defense because early in the trial and consistently throughout its course the court ruled that consideration of

the details of the financial transactions should await determination of the question whether there was a joint venture and then if an accounting were necessary the financial details would be considered; that defendant acceded to that ruling but at the conclusion of the trial the court announced an accounting was not necessary; that defendant then moved to reopen the case, and his motion was denied.

Plaintiff contends that defendant was not curtailed in the presentation of his defense; that the court admonished the parties to put their books of record in evidence so that they would be available to the accountant if an accounting were found necessary; that though defendant produced his records he only put a part of them in evidence, marking the others for identification; that when defendant raised this point at the conclusion of the trial the court ruled it would order an accounting if defendant wanted one, at the sole expense of defendant, but defendant did not accept the tender; that the motion to reopen was properly denied, as within the discretion of the court and because the contents of the books would not change the finding that defendant violated the confidence of the plaintiff, that the figures in the books could not produce a different result because the court had no confidence in defendant's integrity or in the book entries made by him or under his direction.

The problem is not so simple as plaintiff states it. The items in the books and other records might not have a bearing on defendant's conduct, as tortious or not, but they might well have a bearing on the amount of damages which plaintiff sustained. For example, one element of damage was the value of logs processed at the mill, computed at 540,000 board feet, priced at $60 per 1,000 feet less $34 per thousand feet as cost of production, totaling $14,040. During the discussion of that item, defendant's counsel contended that the $34 cost factor was predicated upon operation at full capacity whereas this mill was running but 50 per cent of the time.

The real question is not whether the business records were accurate or the court would have confidence in them or, if accurate and relied upon by the court, they would or would not affect the result. The question is whether or not defendant's counsel may have refrained from tendering full proof in respect to the amounts of the various elements of damage in the belief that the question of liability was to be determined first, damages, if any, later.

Early in the trial, during the cross-examination of Keating under section 2055, when plaintiff's counsel asked him if he had any accounts charged in the name of the Fulton Lumber Company after June, the court said: "Counsel, wouldn't the books be the best evidence? You are asking general questions and getting general answers. If it is necessary to have an accounting and go into their books, the Court will have an accountant do it." Defendant's counsel stated he expected to have available the accountants who kept the books. Plaintiff's counsel then took up another line of inquiry.

When, later, one of those accountants, Mr. Claggett, was on the stand and had identified and described certain of the business records, plaintiff objected to his further testifying at that time and suggested that the case be first tried "on the merits" and that "at the close of the testimony on the merits, a day or so be allowed for the parties to examine the original records that are produced, and then a reconvening of the court, in which the parties who have examined them have a right to raise objections to those original records. If the Court can pass on the objections then and there, it should do so. If it is something only an accountant can pass on, the Court should give instructions to the accountant so that he can make a recommendation." In reference to that the court observed: "Then your suggestion is, I suppose, that you are apparently in agreement on this, that the question should be first passed upon as to what the relationship is existing between these parties," and after further discussion, "I think an order of the court would be proper at this time, ordering both parties to produce all the original records they have and be prepared to give some explanation as to why they cannot be produced . . . after this discussion, Mr. Sinclair [counsel for defendant], do you still feel that Mr. Claggett at this time can offer some assistance to us?" Mr. Sinclair responded, "I don't know, your Honor, whether he can testify to anything today. I mean, assuming we are in agreement that there is to be an independent audit, then I would prefer to turn over the records to the auditors and let them work them out." By the court, "I think that would be better," and a little later, "Why don't we keep as far away from the figures as we can and get in the actual legal relationship of the parties on the 23rd of September [the date suit was filed], and then the Court can make whatever determination necessary to bring the records before the Court

if it is necessary to bring them?" and, after further discussion, "I think this case as a practical matter calls for an interlocutory judgment, the way I feel about it, and then certain other things come after it. I think we have to have an interlocutory judgment first, determining the relationship of these parties, and then what will follow depends upon that." Both counsel agreed and witness Claggett was excused.

Later Glenn Shrader, a witness for defendant, identified the books and described their preparation. Counsel for defendant then discontinued the inquiry, saying "I don't think I will pursue this any further, your Honor. I want to lay the foundation for the books, and if there is going to be an audit, why, I think that is—I think what he has said is sufficient. I think that's all."

Plaintiff introduced in evidence certain bills incurred in the name of Fulton Lumber Company during defendant's management of the business, bills which plaintiff testified had not been paid, so far as he knew. While defendant was on the witness stand, his counsel started to ask him about one of these bills and the following occurred: "THE COURT: Now, aren't we getting back into the question of bills again? Those are bills against the Fulton Lumber Yard? MR. SINCLAIR: Yes. THE COURT: Now, aren't we getting into the accounting angle of it again, Mr. Sinclair?" and defendant's counsel dropped the inquiry.

During the cross-examination of plaintiff, defendant's counsel asked him concerning certain bills he owed on June 1, 1950, and the amounts thereof, when the court interrupted, saying in part: "After all, isn't that what the accounting would show, if the Court decides an accounting is necessary in this? After all, I don't see what was owed or specific accounts owed would have any bearing on the relationship built up between Mr. Keating and Mr. Foster. That is a matter of negotiation between these parties, and I think we have wandered far from the actual meat of the situation, if the Court is going to make an interlocutory judgment which would outline what the Court feels the relationship between the parties were. I fear we are going into a lot of stuff that is wasted time, purely wasted," and "A lot of this . . . isn't going to help me in what I am going to have to decide, which is the relationship that existed between these parties." Thereupon, defendant's counsel dropped this line of inquiry. This incident is of special significance because one of the elements

of damage awarded was an item of $5,000 for obligations owed by plaintiff.

These and several other incidents of similar character convince us that counsel for defendant refrained from going fully into the financial aspects of the situation at this stage of the trial in the reasonable belief that he would have an opportunity to do so after the relationship between the parties had been determined.

It may well be that an accounting was not necessary to aid the court in assessing damages for conversion of plaintiff's business, as distinguished from the accounting that might have been necessary if the court had found that defendant still held the business, as trustee or as coadventurer, for the mutual benefit of the parties. However, the separation of the issues and the direction of the order of proof (determination of the relationship first, the financial aspects later) had the legal effect of casting a duty upon the defendant to refrain from going fully into the financial aspects until the relationship between the parties had been determined, coupled with the right after such determination to complete the presentation of his case by adducing evidence bearing on the financial aspects, whether that should take the form of an accounting or the assessment of damages without an accounting. When the court later decided it was a case for the assessment of damages, not an accounting, and tendered defendant an accounting at his sole expense, defendant had the alternative of moving to reopen the case to complete his proof in the customary manner, the presentation of testimonial and documentary evidence.

"A party is entitled to have received in evidence and considered by the court, before findings of fact are made, all competent, material, and relevant evidence which tends to prove or disprove any material issue raised by the pleadings. [Citations.]" (*Bole* v. *Bole,* 76 Cal.App.2d 344, 345-346 [172 P.2d 936].) It is within the sound discretion of the trial court to define the issues and direct the order of proof but that may not be so done as to preclude a party from adducing competent, material, and relevant evidence which tends to prove or disprove any material issue. (*Pastene* v. *Pardini,* 135 Cal. 431, 432-433 [67 P. 681] ; *Everts* v. *Matteson,* 21 Cal.2d 437, 450 [132 P.2d 476] ; *Lawless* v. *Calaway,* 24 Cal.2d 81, 91 [147 P.2d 604] ; *Theatrical Enterprises, Inc.* v. *Ferron,* 119 Cal.App. 671, 677 [7 P.2d 351] ; *Weinberg* v.

*Dayton Storage Co.,* 50 Cal.App.2d 750, 759-760 [124 P.2d 155].)

We conclude that prejudicial error occurred in the denial of defendant's motion to reopen the case.

(4) *Was the finding that a joint venture agreement existed supported by the evidence? Yes.*

Under this heading, defendant uses the first count of the first amended complaint and ignores the second amended complaint, as defining the issue. The latter, which was filed pursuant to permission properly granted, furnishes the test. (See *O'Melia* v. *Adkins,* 73 Cal.App.2d 143, 147 [166 P.2d 298]; *Valencia* v. *Shell Oil Co., supra,* 23 Cal.2d 840, 848-849.)

The second amended complaint alleged and the court found the formation of a joint venture upon the terms and conditions of the promises and representations which defendant made to plaintiff prior to June 2, 1950, and that plaintiff was fraudulently induced by defendant to sign the writing of June 2d, which was prepared and designed by defendant as a part of his scheme to appropriate plaintiff's business. (See paragraphs 1, 2 and 3 of paragraph II of our summary of the findings.)

Defendant further contends that there can not be a joint venture where the parties have unequal control of operations. That is not the law. (See *Sime* v. *Malouf, supra,* 95 Cal.App.2d 82, 95-96.)

Other phases of this argument were considered and decided in our discussion of the propriety of the amendment to conform to proof.

(5) *Did the court erroneously fail to find that the agreement of joint venture was later cancelled? No.*

We find no substance in this point. The court found upon substantial evidence that late in August, 1950, defendant induced plaintiff to mark the writing of June 2d cancelled as of July, upon the assurance and understanding that the relationship of the parties would not be disturbed thereby. (See paragraph 7 of paragraph II of our summary of the findings.)

Whether the representations which induced plaintiff so to act were of law or of fact is immaterial in view of the confidential and fiduciary relationship.

Even if there had been a cancellation, fraudulently induced, without assurance of a continuation of the joint venture, the fiduciary relationship would not necessarily have been terminated. (See *Sime* v. *Malouf, supra,* 95 Cal.App.2d 82, 99.)

■ Moreover, it would seem legally competent for the parties to an instrument to endorse it "cancelled" without effecting a cancellation, if they orally agree that such endorsement is not intended to and shall not operate as a cancellation. The parties named in a writing couched as a contract may sign it without its taking effect as a contract if that be their intention. (See *Spade* v. *Cossett,* 110 Cal.App.2d 782, 784 [243 P.2d 799], and authorities there cited.)

(6) *Was the award of compensatory damages erroneous because not itemized in the findings and because, as defendant claims, not supported by the evidence?*

We need not consider the sufficiency of the evidence to support the compensatory damages awarded because, as we have found the issue of compensatory damages must be retried.

■ As to itemization of damages in the findings, it appears that the law does not require the separate assessment of the various elements of damages in such a case as this. In *Elsbach* v. *Mulligan,* 58 Cal.App.2d 354 [136 P.2d 651], the court held that there was "no merit in the suggestion that the court should have separately assessed the amount of damages resulting from the loss of the Mumm and McCallum agencies. The action concerns the loss of 'agencies,' and their acquisition by Mulligan by means of a series of acts inextricably woven as to the two—varying at times, but always designed to accomplish one purpose, namely, the promotion of his own interest to the detriment of plaintiff." (P. 368.) We think that principle obtains here.

Defendant relies upon a number of cases which hold that where a party alleges special damages, by separate items, and the opposite party joins issue, there must be a special finding on each. One such case is *James* v. *Haley,* 212 Cal. 142 [297 P. 920], in which the plaintiff specially and separately pleaded that he had been damaged $500 a month for loss of advertising space, $500 for expenditure for additional billboards, $25,000 for loss of patronage because of loss of view and light, and $500 a month by reason of being excluded from three-quarters of his leased premises. (P. 146 of 212 Cal.)

That is not our case. It is true that in his second amended complaint plaintiff stated that he invested $8,000 in the business in addition to his personal services; that he was to receive $350 a month for his services as production manager; that defendant collected proceeds of sale and accounts receivable

in excess of $35,000 and used only a portion of said proceeds to pay obligations of the business; that defendant failed to pay bills incurred before and after June 1, 1950, to the amount at least of $5,000; and that defendant twice sold the business, one time for $1,000 and the other for $7,000 in addition to the assumption by the purchaser of a $7,000 obligation. But he did not assign those figures as items of special damages. They were but a part of his description of the business and of the dealings of the parties. The damage alleged was the lump sum of $31,440, as the monetary measure of the loss caused by defendant's misappropriation and conversion of the business as a whole.

We observe, however, that the trial court in our case did at the conclusion of the trial disclose the basis of its findings of damage, in much the same manner as did the trial court in the Elsbach case. Similarly, in *Union Sugar Co.* v. *Hollister Estate Co.*, 3 Cal.2d 740, 750-751 [47 P.2d 273], and in *Staub* v. *Muller*, 7 Cal.2d 221, 229 [60 P.2d 283], the trial court furnished the basis upon which it computed the damages; by written opinion in the Union Sugar case, by oral statements upon denial of new trial in the Staub case. Such information is helpful upon review. Its furnishing is to be commended.

(7) *Was the award of exemplary damages predicated upon the breach of obligations arising from contract? No.*

Defendant contends that an "award of exemplary damages cannot be sustained, even though a fraud is involved, where such fraud is related to and affects obligations which arise from a contract," citing section 3294 of the Civil Code. (Appellant's Opening Brief, p. 100.)

Here, again, defendant presses his contract theory of the action. This is an action in tort. As held in *Haigler* v. *Donnelly*, 18 Cal.2d 674 [117 P.2d 331], if "the action is one in tort, exemplary damages may be recovered upon a proper showing of malice, fraud or oppression even though the tort incidentally involves a breach of contract. (*Gorman* v. *Southern Pac. Co.*, 97 Cal. 1 [31 Pac. 1112, 33 Am.St.Rep. 157]; *Lyles* v. *Perrin*, 119 Cal. 264 [51 Pac. 332]; *Jones* v. *Kelly*, 208 Cal. 251 [280 Pac. 942]; *Berning* v. *Colodny* [& *Colodny*], *supra*, [103 Cal.App. 188 (284 P. 496)].)" (P. 680.)

However, the element of exemplary damages must be reopened for redetermination along with the compensatory damages.

The applicable statute declares that in an action for the breach of an obligation not arising from contract, "where the defendant has been guilty of oppression, fraud or malice, express or implied, the plaintiff, *in addition to the actual damages,* may recover damages for the sake of example and by way of punishing the defendant." (Civ. Code, § 3294; emphasis added.)

 It would seem necessarily to follow that even though the trial court has determined that this is a proper case for an award of exemplary damages, and there appears no legal reason for redetermination of that question, it would be improper and premature to assess such damages until or concurrently with the assessment of "the actual damages." Until then there are no actual damages for the exemplary damages to be an "addition" to.

This does not mean that the amount of exemplary damages must be proportionate to the amount of actual damages assessed. In *Finney* v. *Lockhart,* 35 Cal.2d 161 [217 P.2d 19], the Supreme Court affirmed an award of $1.00 as actual damages and $2,000 as exemplary damages; in *State Rubbish etc. Assn.* v. *Siliznoff,* 38 Cal.2d 330 [240 P.2d 282], $1,250 as general and special, $4,000 as exemplary damages. (See, also, *Clark* v. *McClurg,* 215 Cal. 279 [9 P.2d 505, 81 A.L.R. 908]; *Sterling Drug, Inc.,* v. *Benatar,* 99 Cal.App.2d 393 [221 P.2d 965].)

 But in the absence of actual damages (in our case, until they are assessed) one of the bases for the assessment of exemplary damages is lacking. Significant is the statement in *Birch Ranch & Oil Co.* v. *Campbell,* 43 Cal.App.2d 624 [111 P.2d 445] : "plaintiff has shown no actual damages, and exemplary damages, being mere incidents and not the basis of a cause of action, are not recoverable in the absence of a showing of actual damages." (P. 628.)

The judgment, which is in the form of a money judgment only, must be reversed, but the findings of fact and conclusions of law insofar as they bear upon and determine the issue of liability are correct and amply supported by the evidence and the law, and will not be disturbed. The cause must be remanded for trial of the issue of damages and the assessment of actual and exemplary damages, if any.

It is, therefore, ordered that the judgment be reversed, with directions that the trial court revise the findings of fact and conclusions of law, and take such further steps and pro-

ceedings in the action as may be meet and proper, all in accordance with the views herein expressed. Each party will bear his own costs on this appeal.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied October 29, 1953, and appellant's petition for a hearing by the Supreme Court was denied November 24, 1953. Shenk, J., and Schauer, J., were of the opinion that the petition should be granted.