[Civ. No. 22490.    First Dist., Div. Two.    May 26, 1966.]

HOLM TIMBER INDUSTRIES, Plaintiff and Respondent, v. PLYWOOD CORPORATION OF AMERICA et al., Defendants, Cross-complainants and Appellants; G. W. WESTOVER, Defendant, Cross-defendant and Respondent.

Cushing, Cullinan, Hancock & Rothert and Harlow P. Rothert for Defendants, Cross-complainants and Appellants.

Robert Y. Bell and Petersen & Petersen for Plaintiff and Respondent.

No appearance for Defendant, Cross-defendant and Respondent.

SHOEMAKER, P. J.—Plaintiff Holm Timber Industries brought this action to recover compensatory and exemplary damages for trespass, injury to real property and conversion of portions of a sawmill located on said property. The complaint named as defendants Plywood Corporation of America (hereafter referred to as "Plyco"), Wally Bushberg, Norman Bushberg, G. W. Westover and Albrite Manufacturing Company.

All of the defendants except Westover filed a joint answer, denying the material allegations of the complaint. Defendants Plyco and Wally Bushberg also cross-complained against Westover, alleging that he had represented himself to be the owner of certain equipment and machinery located in the

sawmill mentioned in the complaint, had offered to sell said equipment and machinery to cross-complainants, and had thereby induced them to remove certain of those items from the sawmill. Cross-complainants sought to be indemnified by Westover for any damages which plaintiff might recover against them.

Westover, by way of answer to the cross-complaint, admitted that he had represented himself to be the owner of 300 feet of conveyor chain located in the sawmill and that he had sold said chain to cross-complainants. He denied the remaining allegations of the cross-complaint.

Pursuant to stipulation of the parties, the action was dismissed prior to trial as against defendant Albrite Manufacturing Company. Defendant Wally Bushberg died prior to trial, and Gloria Bushberg, the executrix of his estate, was substituted in his place as defendant and cross-complainant.

The evidence may be summarized as follows: Plaintiff Holm Timber Industries is a family partnership consisting of Fred Holm and his son and daughter, Richard Holm and Janet Ramsey. Defendant Plyco is a family corporation, with Wally Bushberg having served as its president until his death and Norman Bushberg, his son, having served as its vice-president.

One of plaintiff's partnership assets is a sawmill located on Iversen Road between Gualala and Point Arena, California. The mill was constructed in 1955 under the supervision of Stanley Arasmith, who was furnished with partnership funds which he used to employ construction workers and to purchase equipment for the mill. For a short time after the mill was completed, plaintiff employed Arasmith to operate the mill.

The mill was operated continuously from the time of its completion until September 1958, when the gang saw rig broke down. Although the mill's circular saw was still operable independent of the gang saw, plaintiff elected to cease operating the mill. Signs which read ''No trespassing without written permission, Holm Timber'' were posted inside the mill and on the land surrounding the mill. Plaintiff's employees removed and preserved all of the equipment, sprayed the exposed motors with a preservative and cleared away the rubble in preparation for the eventual installation of a new gang saw rig. Since the lumber market was not good at the time and a new gang saw rig would have cost $16,800, whether the mill should be reactivated was left undecided.

Richard Holm testified that he made weekly patrols of the

Iversen Road mill site. During the course of an inspection made in October 1959, he discovered that various items of equipment had been removed from the mill. Some of these items had previously been attached to the mill and appeared to have been severed from their moorings by the use of a cutting torch. Certain boards at the back of the mill had been broken in order to allow for the removal of the equipment.

Holm reported his loss to the sheriff, and a few days thereafter he was notified that some of the missing equipment had been located at a veneer plant which Plyco was then in the process of constructing at Manchester, California. Holm and his former mill superintendent, Earl Guido, then accompanied a deputy sheriff to the veneer plant and identified various items of equipment, including 300 feet of conveyor chain, pulleys, shafts, sprockets and assorted pieces of iron. A live deck, which had been taken from plaintiff's mill but which plaintiff concededly did not own, was also found at the veneer plant.

Holm testified that all of this equipment except for the live deck had been purchased with funds which he had given to Arasmith or paid directly to equipment dealers or manufacturers. He produced 16 checks, totaling $91,500, which had been written in Arasmith's favor during the year 1955. He produced two additional canceled checks, in the amounts of $16,800 and $3,045.50, which were in favor of Schnitzer and Wolf. The first of these was for the purchase of the gang mill. Holm was sure that the conveyor chain had been purchased from the Bay City Iron Works but was unable to produce any invoices, bills of sale or other documents indicating ownership of any particular pieces of equipment. He stated that he had never asserted an interest in the live deck and that Arasmith had initially claimed to own it. After Arasmith left his employ, however, Holm learned that it was actually owned by Westover and told him to remove it at his convenience.

Robert Phillips, who was employed by Plyco as the manager of the Manchester plant, was present when Holm and Guido arrived at the plant and began identifying the items taken from plaintiff's sawmill. Phillips readily admitted having taken the equipment and stated that Plyco's president, Wally Bushberg, had instructed him to do so. Phillips then informed Holm that Plyco's vice-president, Norman Bushberg, was on the telephone and wanted to talk with him. During the course of the telephone conversation which then ensued, Bushberg indicated that he had purchased the equipment taken from

plaintiff's mill and had a bill of sale. He informed Holm that he would like to meet with him to discuss the matter further and stated that he was sure that he and his father could straighten it out.

Holm returned to the Manchester plant approximately three weeks later and met with Wally and Norman Bushberg. The two men told Holm that they had purchased the equipment from Westover, that a mistake had been made, but that they were sure something could be worked out.

Wally Bushberg subsequently telephoned Fred Holm, who was then in poor health and under a doctor's care, and asked if he might come to see him. Holm replied that in view of the state of his health, he was unwilling to discuss any business connected with the mill and that his son would handle the matter. Bushberg nevertheless went to see Fred Holm and made an unsuccssful attempt to persuade him to accept a $300 check as payment for the equipment taken.

When Richard Holm learned that his father had been upset by the visit, he telephoned Norman Bushberg and expressed his disapproval. Bushberg replied that if that was his attitude, they would pay nothing for the equipment and Holm would have to sue them. All negotiations between the parties appear to have terminated at this point.

In a deposition which was read into evidence, Westover stated that he had sold Stanley Arasmith approximately $30,000 worth of equipment which was installed in plaintiff's mill. At the time Arasmith made the purchases, Westover believed that he owned the mill and was unaware that plaintiff had any interest therein. The equipment was sold under conditional sales contracts and was never paid for by Arasmith, who subsequently left the state. Although Westover later acquired the impression that Richard Holm had some sort of interest in the mill and that he and Arasmith had been involved in a joint venture, he never billed plaintiff for the equipment because be believed that Arasmith had purchased it in his own right. In 1959, Wally Bushberg visited Westover's Oakland office and informed him that he was interested in obtaining machinery and equipment for a mill which Plyco was constructing. Westover agreed to sell Plyco the live deck and the 300 feet of conveyor chain which were subsequently removed from plaintiff's mill. Westover sold the conveyor chain for $350 and received full payment for it. Westover admitted telling Bushberg that he owned numerous other pieces of equipment in the mill and that these items were also

for sale. However, he denied representing that all of the equipment in the mill was his and stated that when Bushberg inquired about the burner and the assorted pieces of iron, he had told him that they belonged to Richard Holm. He also denied that he had ever authorized Bushberg to go to the mill and take whatever equipment he was interested in buying. Westover specifically identified the 300 feet of conveyor chain and stated that he had made it himself and had sold it to Arasmith.

Robert Phillips, the manager of Plyco's veneer plant, testified that he and Wally Bushberg had gone to Westover's office in the summer of 1959. Bushberg told Westover that he wanted to buy used equipment for a new mill, and Westover then stated that he owned all of the equipment in the "Iversen Landing mill" except for the burner. Phillips further stated that Westover told him to go to the mill and take whatever he wanted, and that the purchase price could be agreed upon later. Phillips subsequently made three trips to the mill, removing a considerable amount of equipment. He denied knowledge of the fact that the mill or the property on which it was located belonged to plaintiff and stated that he did not know who Richard Holm was at the time and was unaware that he had any interest in the mill, the equipment, or the land. He had always thought of the mill as the "Arasmith mill." He did not notice any no trespassing signs at the mill. When Holm and the deputy sheriff subsequently came to the Manchester plant, he was shocked to learn that he was suspected of taking equipment which did not belong to him, and he immediately informed them that the equipment had been bought and paid for by Plyco. He then telephoned Norman Bushberg and was assured that the matter would be straightened out.

The deposition of Wally Bushberg was also read into evidence. He stated that he had initially purchased the live deck and chain from Westover and was thereafter assured that if he saw anything else at the mill and wanted to purchase it, he could simply remove it and pay Westover 50 percent of the list price for the particular item. He denied that Westover had ever told him that the burner belonged to Holm and stated that the subject never arose because he had already purchased a burner and was not in the market for one. When he asked Westover about the assorted pieces of iron, he was told to go ahead and take them. Westover never mentioned Holm's name, and Bushberg believed that Westover owned all the

equipment in the mill. After his meeting with Richard Holm, he talked with Westover, who still insisted that the equipment was his but offered to return the money which Bushberg had paid him. Bushberg replied that he would accept this offer only if Fred Holm would agree to take back the equipment and release him from liability. Westover then gave him a bill of sale covering the equipment he had purchased.

Norman Bushberg testified that he was present on one occasion when Westover told him and his father that they could remove anything they wanted from the mill and pay for it later. Westover told them of his prior dealings with Arasmith and stated that the mill equipment was his and that he was entitled to sell it. Bushberg was not present when any equipment was removed from plaintiff's mill and had not directed said removal.

Richard Holm testified that the total value of the equipment taken was $4,000 to $5,000. However, when questioned as to the manner in which he had arrived at this estimate, he stated only that he had paid $6.00 to $7.00 a foot for the 300-foot conveyor chain in 1955. He was unable to give the value of any other item taken from the mill. Although Holm initially stated that he had incurred actual expenses of $350 in pursuit of the missing equipment, he ultimately admitted that he had spent a total of $30 to $35 prior to locating and identifying the equipment at the Plyco plant.

Holm was also allowed to testify, over repeated objections by the defense, that the removal of the equipment taken had rendered nonfunctional $15,000 worth of machinery which was previously operative. He based this opinion upon the fact that the parts removed had disabled the conveyor through which sawdust and other waste products were carried from the mill. Although the circular saw, edger, trimmer and burner were apparently still operative, Holm stated that if he were to start the mill, the lack of a conveyor would have resulted in the mill becoming clogged with accumulated waste within a few minutes. He admitted that the damage to the mill was minimal and that if the missing equipment were returned and reinstalled, the mill machinery would function just as it had before.

Plaintiff's expert witness, Samuel Douglas, testified that the equipment removed from the mill was worth $2,609.73. Costs of reinstallation would be $320 if plaintiff used its own employees, and $640 to $650 if it employed labor from an independent source. He also stated, over defense objections,

that the total value of the machinery in the sawmill was $19,700.

Robert Phillips was of the opinion that the equipment taken was worth $1,250.

At the conclusion of the trial, the court granted defendant Norman Bushberg's motion for a directed verdict in his favor.

The jury returned a verdict in favor of plaintiff and against the three remaining defendants, finding that plaintiff was entitled to recover compensatory damages in the amount of $7,500 and exemplary damages in the amount of $5,000 from defendants Plyco and Gloria Bushberg, and compensatory damages in the amount of $350 and punitive damages in the amount of $5,000 from defendant Westover. The jury further found that cross-complainants Plyco and Gloria Bushberg were entitled to recover damages in the amount of $350 from cross-defendant Westover.

Plyco and Gloria Bushberg filed notice of appeal from the judgments entered in accordance with the verdicts on both the complaint and cross-complaint, and from orders denying their motions for new trial and for judgment notwithstanding the verdict. The order denying a new trial is nonappealable.

Appellants apparently concede that there is sufficient evidence to support the jury's implied finding that all of the equipment taken from the mill, with the exception of the live deck, was owned by respondent. Appellants confine their attack to the damages, both compensatory and punitive, which were awarded under the complaint and cross-complaint.

Appellants contend that the compensatory damages awarded to respondent were the result of (1) the erroneous admission of evidence that the removal of the equipment taken by appellants rendered inoperative virtually all of the machinery in the sawmill, and (2) the erroneous giving of instructions to the effect that the conversion of the substantial and essential parts of an entire chattel will, if the chattel is a complicated mechanism constructed to perform certain work, amount to a conversion of the whole, if the removal of such parts so impairs the chattel as to destroy its character as a whole and defeat its intended use.

Appellants assert that since respondent's own expert testified that the equipment removed from the mill was worth only $2,609.73 and could be reinstalled for a maximum cost of $650, the jury must of necessity have based its award of $7,500 in compensatory damages upon Richard Holm's testimony that

$15,000 worth of equipment had been rendered inoperative by the removal of the equipment taken by appellants. They contend that Holm's testimony to that effect should have been excluded because his $15,000 estimate included the value of machinery (such as the circular saw, edger, trimmer and burner) which was totally undamaged by the taking. Appellants also assert that since respondent's sawmill had been out of operation for a year prior to the taking, there is no evidence that respondent suffered a loss of profits or other consequential damages as a result of its alleged inability to operate any or all of the equipment in the mill. They further contend that the compensatory damages awarded on the complaint are totally inconsistent with the damages awarded on the cross-complaint because the former award took into consideration the value of all the sawmill equipment affected by the taking and the latter award was based solely upon the value of the 300 feet of conveyor chain without regard for any effect which its loss may have had upon the equipment remaining in the mill.

Respondent asserts that the court was correct in instructing the jury that the taking of part of a chattel can, under certain circumstances, amount to a taking of the whole. However, respondent makes no attempt to justify the admission of the testimony pertaining to the value of all or virtually all of the equipment in the mill. Respondent's primary contention is that any error in the admission of evidence or in the giving of instructions was nonprejudicial because the jury's award of compensatory damages did not include any amount for equipment which was affected by the taking but not actually removed from the mill. Respondent asserts, more specifically, that the jury could have arrived at a higher verdict than it did by computing compensatory damages as follows:

$5,000—Value of equipment taken according to Richard Holm
  650—Reinstallation cost according to Douglas
  350—Costs of pursuit according to Richard Holm

———
$6,000
  1,715—7 percent interest per annum for four years and one month (October 1959 to November 15, 1963)

———
$7,715—Total compensatory damages

Respondent's analysis of the jury's verdict is untenable. First of all, Richard Holm admitted, as above noted,

that his total costs of pursuit were $30 to $35, rather than $350. Once respondent's calculations are corrected so as to correspond with Holm's testimony in this regard, they immediately fall below the amount of the jury's award. Moreover, to assume that the jury based its award upon Holm's testimony that the equipment removed was worth $5,000 is to ignore the fact that the jury awarded respondent compensatory damages of only $350 against Westover and awarded appellants the same amount on their cross-complaint against Westover. These awards clearly show that the jury believed Westover's testimony that he had never claimed ownership of anything but the conveyor chain and further believed that the chain was worth only $350, the amount for which appellants had purchased it from Westover. Since Holm's $4,000 to $5,000 estimate of the value of the equipment taken was based in part upon the fact that he had paid $6.00 to $7.00 a foot (or a minimum of $1,800) for the 300-foot conveyor chain, we are compelled to conclude that the jury, having found said chain to be worth only $350, must have discounted Holm's estimate by at least $1,450. The jury must similarly have discounted Douglas' $2,609.73 estimate by $787, since he had attributed a value of $1,137 to the conveyor chain.

In the light of the foregoing, it is apparent that the jury could not and did not base the compensatory damages assessed against appellant solely upon the value of the items taken from the mill, but also gave consideration to Richard Holm's testimony that other machinery and equipment remaining in the mill were rendered inoperative by the removal of the equipment taken. It is equally apparent that the jury did not take this testimony into consideration when assessing compensatory damages against Westover on either the complaint or cross-complaint. Richard Holm specifically stated that the removal of the conveyor chain contributed to the inactivation of the conveyor system and thereby rendered other equipment and machinery inoperative. Of necessity then, at least some portion of the damages which the jury found to have resulted from the inactivation of the equipment and machinery remaining in the mill ought to have been attributed to the removal of the conveyor chain and assessed against Westover on the complaint and cross-complaint. The jury's failure to do so indicates to us that it calculated the compensatory damages assessed against appellants in an entirely different manner than it calculated the compensatory damages assessed against Westover on both the complaint and cross-complaint. Since

these verdicts are obviously irreconcilable, the judgments based thereon cannot be allowed to stand. (*Remy* v. *Exley Produce Express, Inc.* (1957) 148 Cal.App.2d 550, 553-554 [307 P.2d 65].)

■ Although the element of exemplary damages must be reopened for redetermination along with the compensatory damages (*Foster* v. *Keating* (1953) 120 Cal.App.2d 435, 454-455 [261 P.2d 529]), it is of importance to note, in the event of a retrial, that the award of exemplary damages against Gloria Bushberg, the executrix of Wally Bushberg's estate, was clearly improper. It is settled that exemplary damages may not be recovered from the estate or from the executor of a tortfeasor who dies prior to trial. (*Evans* v. *Gibson* (1934) 220 Cal. 476, 489-491 [31 P.2d 389]; *Simone* v. *McKee* (1956) 142 Cal.App.2d 307, 316 [298 P.2d 667].) A thorough review of the record also raises grave doubts as to the sufficiency of the evidence to justify a finding that any of the defendants acted with the ''malice in fact'' required to justify an award of exemplary damages. (See *Sturges* v. *Charles L. Harney, Inc.* (1958) 165 Cal.App.2d 306, 320-321 [331 P.2d 1072].)

There would also appear to be considerable merit to appellants' contention that the jury's evident confusion in assessing damages was the result of the admission of Richard Holm's testimony that virtually all of the equipment in the sawmill was rendered inoperable by the removal of the equipment taken from the mill and by the giving of instructions to the effect that the taking of parts of a chattel may, under certain circumstances, constitute the taking of the whole. Although the instructions given would appear to be a correct statement of the rule discussed in *Horn* v. *Klatt* (1944) 65 Cal.App.2d 510, 517-521 [151 P.2d 149], there is nothing in that case to suggest that the taking of parts of a particular machine can be deemed to constitute not only a taking of that machine but of other equipment and machinery which remain independently operable after the taking. ■ In the instant case, Holm did not testify as to the value of any one piece of machinery which had been rendered inoperable by the removal of a part thereof, but made the blanket statement that mill equipment and machinery of a total value of $15,000 became inoperable as a practical matter once the refuse conveyor system ceased to function. The admission of this testimony, coupled with the instructions that the taking of parts of a chattel could constitute the taking of the whole, can only be justified on the theory that the taking or incapacitation of any

one essential machine in a factory assembly line constitutes the taking of the entire factory. Even if it could be assumed that such a theory constitutes a proper extension of the rule discussed in *Horn* v. *Klatt, supra,* consideration should certainly be given, in the event of a retrial, to the evidence that the entire sawmill had been idle for a year prior to the taking. (*Kertz* v. *Paris* (1959) 168 Cal.App.2d 67, 70 [335 P.2d 154].)

The purported appeal from the order denying a new trial is dismissed, and the order denying judgment notwithstanding the verdict is affirmed. The judgments are reversed.

Agee, J., and Taylor, J., concurred.

A petition for a rehearing was denied June 24, 1966, and the petition of the plaintiff and respondent for a hearing by the Supreme Court was denied July 20, 1966.