[Civ. No. 38728. Second Dist., Div. Two. Apr. 17, 1972.]

CLAIRE P. STONER, Plaintiff and Appellant, v.
JOE WALSH, Defendant and Respondent.

---

---

## COUNSEL

O'Connor & Wood and Timothy M. O'Connor for Plaintiff and Appellant.

Gerlach, Harker, Langworthy & Oyler and Connolly Oyler for Defendant and Respondent.

---

## OPINION

**FLEMING, J.**—This appeal is from an order staying enforcement and execution by Claire P. Stoner of a judgment secured by her against Joe Walsh. The judgment was the outgrowth of a domestic melodrama played in 1967 when Joe and Claire, friends and coworkers at North American Aviation since 1959, each filed suit for divorce from their respective spouses Lois and Robert with further matrimony in mind. Joe negotiated a property settlement with his wife Lois and agreed to pay her $10,690 for her interest in their house and furniture on Wynkoop Avenue and a waiver of support. But a hitch developed. Lois wanted payment in cash, and Joe had no cash. "The divorce is off," Joe told Claire. But Claire had money in her savings account, and she was willing to lend $10,690 to Joe. Joe promised to give her a note secured by a deed of trust on the Wynkoop house, for which he shortly thereafter substituted a promise of a deed of trust on apartments on Manchester Avenue he planned to acquire in trade for the Wynkoop house. On 23 August 1967 Claire withdrew $10,690 from her savings account and gave it to Joe, who paid it to his wife Lois, who in turn quitclaimed the Wynkoop house to Joe and thereafter invested her property settlement money in other Los Angeles property. Meanwhile Claire moved into the Wynkoop house with Joe.

Within a few days Joe initiated escrow arrangements to trade the Wynkoop house for the Manchester apartments, and on 25 September 1967 he prepared a non-interest-bearing promissory note for $10,690 payable to Claire on 1 January 1969 and secured by a deed of trust on the Manchester apartments and delivered these documents to the attorney who represented both Joe and Claire in their respective divorce actions. Joe

told Claire not to record the deed of trust for six months because recordation would interfere with his financing arrangements. According to Claire: "He just said, 'Don't tell anyone about the loan and understand you can't record the trust deed because if you record it, the loan company will find out about me owing you this money and I won't be able to get the loan, so keep it quiet for six months and then you can record it.' "

In November 1967 the escrow closed, Joe obtained his divorce from Lois, and Joe and Claire moved into the Manchester apartments. But happiness evidently eluded them, for on 15 December Joe reconciled with his divorced wife Lois. On 16 December, by means of coercive tactics against Claire, Joe obtained Claire's written authorization to pick up from the attorney's office Claire's unrecorded note and deed of trust on the Manchester apartments, which Joe then destroyed. Thereafter Claire returned to her husband Robert, and Joe remarried Lois. Thus at the end of 1967 Lois had the Los Angeles property she had purchased with her settlement money, Joe had the Manchester apartments, and Claire had Joe's broken promises.

In February 1968 Claire filed suit against Joe to get her money back. On 16 September 1968 she obtained a writ of attachment, and on 19 September 1968 the marshal recorded a levy of attachment upon the Manchester apartments. On 26 September 1968 Joe and Lois recorded a homestead on the Manchester apartments. The following year, on 13 November 1969 Joe stipulated to the entry of judgment against him for $13,000, and under the stipulation he promised to pay Claire $300 per month starting 15 November and larger amounts at later times. Execution on the judgment was stayed pending payment of the installments. But Joe paid nothing, and instead filed a petition in bankruptcy on 26 November. He later testified that at the time of the stipulated judgment he had no intention of making any payment and was planning to file in bankruptcy. For example:

"Q. At the time that you were in court in October of 1969 and stipulated to this judgment, was it your intention to pay Mrs. Stoner?

A. No.

Q. You knew at that time you were going to go through bankruptcy, didn't you?

A. Well, the thought prevailed, the act hadn't been decided."

In May 1970 Joe secured a discharge in bankruptcy under which he retained the Manchester apartments. In September 1970 Claire sought to

execute on the Manchester apartments to collect her stipulated judgment. Joe then obtained an order from the trial court staying further proceedings on the judgment and setting aside the writ of execution (Code Civ. Proc., § 675c), an order which forms the subject of this appeal.

■ Joe offers two justifications for the stay of further proceedings on the stipulated judgment and the vacation of the writ of execution. First, he argues that his discharge in bankruptcy absolved him from payment of the judgment to Claire. However, the fraud of the debtor prevents the discharge of a debt in bankruptcy. (Bankruptcy Act, § 17; 11 U.S.C. § 35; *Wilson* v. *Walters,* 19 Cal.2d 111 [119 P.2d 340]; *O'Brien* v. *Appling,* 133 Cal.App.2d 40, 41-42 [283 P.2d 289].) If we accept for the moment the trial court's conclusion there was insufficient evidence to establish fraud in the initial flotation of the loan, still the evidence is uncontradicted and overwhelming that Joe committed fraud in inducing Claire to enter the stipulated judgment. Joe testified several times he never intended to make the payments required by the stipulated judgment and was contemplating bankruptcy at the time he promised to make them. Under the Bankruptcy Act, the "honest but merely mistaken debtor is considered eligible for relief. The deliberate schemer is not." (Cowans, Bankruptcy Law and Practice, § 442, p. 229.) Prior to the stipulated judgment, Claire had the right to establish a lien on Joe's apartment building which would have protected her in bankruptcy as a secured creditor. (*Citizens' Bank* v. *Rucker,* 138 Cal. 606 [72 P. 46].) By accepting the proffered money judgment she relinquished that immediate protection in return for Joe's promise to pay money, a promise Joe never intended to keep and which he thought would be discharged in bankruptcy. By tendering the false promise Joe not only obtained a valuable property right (relinquishment of the lien) but also obtained an extension of credit through the stipulated stay of execution on the judgment. His promise was clearly fraudulent (*Wells* v. *Blitch* (1936) 182 Ga. 826 [187 S.E. 86, 90]), and Joe was clearly the "deliberate schemer" whose broken promise the Bankruptcy Act does not protect. (Bankruptcy Act, § 17(a)(2); 11 U.S.C. § 35(a)(2).)

■ Joe's second line of defense concedes the vitality of the judgment but claims his apartment building is exempt from execution as a homestead. (Civ. Code, § 1237 *ff.*) We disagree. ■ On this aspect of the cause we look behind the judgment and at the use to which the borrowed money has been put, for a homestead may be attacked by a defrauded creditor whose money has been used to acquire the homestead itself. (*Duhart* v. *O'Rourke,* 99 Cal.App.2d 277, 280 [221 P.2d 767]: "A homestead may, however, be successfully attacked by a creditor where money fraudulently obtained from him is invested in and constitutes part of the home-

stead. Under such circumstances, the right of the creditor so defrauded be- . comes paramount to that of the owner of the homestead, depending upon the facts of the case, and the property so homesteaded is not exempt from execution or sale.") ▇ Here, it is apparent from the facts both that the creditor's money went into the homestead property and that the creditor had been defrauded. Essentially, Joe used Claire's money to acquire full title to the Wynkoop house, which he then traded for the Manchester apartments. Execution against the Manchester apartments therefore amounted to execution against the proceeds of the loan. On the issue of fraud, although the trial court concluded that Joe's initial arrangements to borrow the money were not fraudulently conceived, nevertheless active fraud was practiced at the time Joe reconciled with his former wife Lois and while the mechanics of the loan transaction were still in process of completion. The terms of the loan contemplated a note and deed of trust on Joe's only asset of substance—the Wynkoop house, later metamorphosed into the Manchester apartments. By counseling six months delay in recordation and later tearing up Claire's note and unrecorded deed of trust Joe effectively prevented Claire from recording a lien against the Manchester apartments for the money she had lent him and from obtaining the security he had promised to give her. Claire was entitled to rely on Joe's request not to record the deed because a confidential relationship existed between the two. Such a relationship need not be legal; it may be moral, social, domestic, or, as here, personal. (*Foster* v. *Keating,* 120 Cal.App.2d 435, 445 [261 P.2d 529]; *Cox* v. *Schnerr,* 172 Cal. 371, 378 [156 P. 509].) In brief, Joe's fraudulent conduct prevented the loan from coming into existence as a secured transaction in accordance with its terms. Joe's conduct is comparable to that of a man who borrows money from a bank and promises in good faith to return to the bank the following day and sign a note and deed of trust. Overnight he has a change of heart, and having gotten the money he decides not to sign the note and deed. We think there, as here, the late-blooming fraud relates back to the inception of the loan and makes the entire transaction fraudulent, even though the fraudulent intent might not have flowered until important aspects of the transaction had been completed. In our view the borrowing undertaken by Joe became permeated with the taint of fraud before the loan transaction was fully consummated, and as a consequence the defrauded creditor is entitled to execute against the homestead into which the fraudulently borrowed money was put. (*Kemp* v. *Enemark,* 194 Cal. 748 [230 P. 441].)

In summary, Joe may not use for dishonest ends legal protections established for the honest debtor, and he may not profit from his own wrong; the stipulated judgment was not discharged by the bankruptcy, and

execution was not foreclosed by the homestead. The order of the trial court staying proceedings on the judgment and vacating the writ of execution is reversed.

Herndon, Acting P. J., and Compton, J., concurred.