**In re Loumis S. TAYLOR, Debtor.**

**Lillian WILLIAMS, Plaintiff,**

v.

**Loumis S. TAYLOR, Defendant,**

**and**

**Virginia Mortgage and Investment Company, Inc., Intervenor.**

**Bankruptcy No. 80–00267.**
**Adv. No. 80–0069.**

United States Bankruptcy Court,
District of Columbia.

Jan. 16, 1981.

Leonard I. Rosenberg, Washington, D.C., for plaintiff Lillian Williams.

Leonard Graff, Washington, D.C., for defendant Loumis Taylor.

Wallace H. Kleindienst, McLean, Va., Joanne F. Alper, Washington, D.C., for intervenor Virginia Mortg. & Investment Co.

## MEMORANDUM OPINION

ROGER M. WHELAN, Bankruptcy Judge.

This proceeding involves a complaint filed by the plaintiff, Lillian Williams, to determine the dischargeability of debt under 11 U.S.C. § 523(a)(2). The plaintiff, in her complaint, alleges that the debtor, Loumis S. Taylor, falsely and fraudulently represented to Mrs. Williams (the creditor) that he would assign his right, title and interest in a contract to purchase real estate at 317 Crittenden Street, N.W., Washington, D.C. For this contract right, she paid the debtor a total of $18,500. However, on November 26, 1979, the debtor went to settlement on the property without advising the settlement agent that his rights under the contract had been assigned to the creditor. A deed was executed in favor of the debtor as sole owner in violation of the creditor's rights.

Based on the evidence adduced at the trial on December 2, 1980, and after assessing the credibility of the witnesses, the Court finds the facts of record as follows. On July 23, 1978, Loumis S. Taylor entered into a contract to purchase 317 Crittenden Street, N.W., for $52,000. Debtor put down $5,000 as a down payment. On November 15, 1978, a second contract was signed to purchase the property using FHA financing. This second agreement was entered into because the contract of July 23, 1978, did not have a FHA provision which is required to apply for FHA financing. Debtor then began to contact banks in an effort to seek financing. However, he never submitted any written applications to banks and could not recall what banks or loan officers he contacted. On June 19, 1979, Mr. Taylor, through a written agreement assigned his right to purchase the property over to Mrs. Lillian Williams, the plaintiff. (Plaintiff's Exhibit No. 1.) The consideration stated was $15,000; however, no money was transferred at this time.

Plaintiff later gave to defendant a $12,000 certified check which he deposited in his personal checking account. Defendant testified that he assigned his rights to plaintiff because of a close relationship he shared with plaintiff and her daughter, Rosemary Pruitt, with whom he was at this time contemplating marriage. The debtor testified he was thoroughly familiar with Mrs. Williams' financial situation and her concern about the amount of taxes she paid each year. Mrs. Williams testified that her income from her job as a cleaning woman on the Hill was approximately $18,000 a year. The debtor testified that in light of his experience in arranging real estate deals for others, and his training in the field as a management consultant, he felt equipped to advise Mrs. Williams on obtaining a tax shelter through real estate investment. He also stated that he decided to assign his right to the plaintiff because he could not obtain the financing needed to close the deal. Debtor testified that he informed both the real estate company (Boss and Phelps) and National Savings and Trust that his rights had been assigned. However, testimony by representatives of both those companies indicate that neither was ever informed of this fact. Virginia Mortgage Company, who ultimately gave debtor a mortgage on the 317 Crittenden Street, has also indicated through their pleadings that they were never informed of the assignment.

In a letter dated June 1, 1979, Mrs. Williams agreed to purchase the property for $65,000. Based on the testimony given by Mrs. Williams, it appears that Mr. Taylor never told the plaintiff that he already had a contract on the property. Following the assignment, plaintiff transferred to debtor in July, 1979, $800 (Plaintiff's Exhibit No. 3) and $1,000 (Plaintiff's Exhibit No. 4). She was told these were for repairs on the property. She further gave him an additional $3,273.67 borrowed through American Express. At the suggestion of the defendant, plaintiff subsequently refinanced her home for $50,000. Due to a lien on her house and other bills, Mrs. Williams only received $12,000 from the transaction. When she informed Mr. Taylor that she would not be able to go through with the deal because she only had $12,000, he told her to give him the $12,000 and he would be able to obtain the balance for her through a mortgage company. Mr. Taylor then placed the $12,000 in his personal checking account at Union First. Plaintiff then testified that she never saw the debtor again even though she left messages on his answering service. She subsequently found out that he had bought the property at 317 Crittenden Street, N.W., and her name was not on the deed of title. She brought suit in the Superior Court for the District of Columbia for specific performance. (Civil Action No. 3446–80). On May 6, 1980, a Preliminary Injunction was issued against the debtor by the Superior Court for the District of Columbia prohibiting him from entering into any contract concerning the sale of 317 Crittenden Street, N.W., pending further order of that Court. On June 24, 1980, a default judgment was entered into against the debtor for failing to file his answer or otherwise defend that action.

Pursuant to this default judgment, a hearing on *ex-parte* proof was scheduled in the Superior Court for the District of Columbia on September 18, 1980. In the intervening period between the entry of the default judgment and the date set for *ex-parte* proof, the creditor was notified that the debtor had petitioned the Bankruptcy Court; and, therefore, the hearing on *ex-parte* proof in the Superior Court was not held.

## I. Fraudulent Behavior.

■ Debtor claims that his behavior would only give rise to a breach of contract and could not form a basis for a claim of fraud. Debtor argues that since this is a breach of contract, debtor's liability to the plaintiff is not based upon non-dischargeable conduct. For this proposition, he cites *In Re Lawrence.*[1] *In Re Lawrence* involves a situation where a creditor alleged that debtor fraudulently induced the creditor to buy worms by representing that worms would double themselves every three months and debtor corporation would then buy them back. The Court held that not every promise as to what will be done in the future can form the basis for a claim of fraud. Where there is a promise without a preconceived and undisclosed intention of not performing—there is no fraud—only a breach of contract. This is not analogous to the present case. Based on the evidence presented, the Court finds that there was fraudulent behavior involved. The plaintiff has proven all the elements of fraud—representation, falsity, scienter, deception and injury.[2] Debtor also cited the case of *Bernheimer v. Rindskopf*[3], which is also quoted in the *In Re Lawrence* opinion for the proposition that "[f]raud cannot be presumed. It must be proven, and if there is left room for the inference of an honest intent, the proof of fraud is wanting." The Court

finds in this situation there is no room left for the inference of honest intent. Mr. Taylor never intended to turn the property over to Mrs. Williams. During the initial negotiations he did not tell her he already had a contract on the property. He then entered into an assignment with her to turn his rights over to Mrs. Williams. However, he never informed the real estate company, the bank who ultimately gave him the mortgage, nor the bank who held the property as trustee that an assignment had been made. He then induced Mrs. Williams to give him money to make repairs on the property. He also counseled her to refinance her home. However, after the refinancing when plaintiff informed debtor she only had $12,000 left from the refinancing, he told her to give him the money and he would help secure a mortgage for the 317 Crittenden Street property. He then deposited the $12,000 in his personal account. Based on this evidence, the Court finds fraud, and holds that this debt will not be discharged pursuant to 11 U.S.C. § 523(a)(2)(A).

## II. Debtor is not entitled to claim the 317 Crittenden Street property as an exemption.

■ There is no question that a debtor may convert his existing non-exempt property into exempt.[4] However, "(a) homestead may ... be successfully attacked by a creditor where money fraudulently obtained from him is invested in and constitutes part of the homestead. Under such circumstances, the right of the creditor so defrauded becomes paramount to that of the owner of the homestead, depending upon the facts of the case, and the property so homesteaded is not exempt from execution or sale."[5]

Debtor's fraudulent conduct in not advising concerned parties that his rights had been assigned prevented plaintiff from

1. 1 B.R. 402, 405 (S.D.N.Y. 1979).

2. *Reno v. Bull*, 226 N.Y. 546, 124 N.E. 144 (1919).

3. 116 N.Y. 428, 436, 22 N.E. 1074, 1075 (1889).

4. *In Re White*, 221 F.Supp. 64, 67 (N.D. Calif. 1963).

5. *Duhart v. O'Rourke*, 99 Cal.App.2d 277, 280, 221 P.2d 767, 769 (1950), as quoted in *Stoner v. Walsh*, 24 Cal.App.3d 938, 943, 101 Cal.Rptr. 485, 488 (1972).

standing in the shoes of a secured creditor. While plaintiff had a right to establish a lien on Mr. Taylor's apartment building, the bankruptcy halted the proceedings that were before the D.C. Superior Court. Plaintiff did not sit on her rights. She took every step necessary in order to perfect her interest. It was through Loumis Taylor's fraudulent behavior that Mrs. Williams' rights were jeopardized.

### III. The defendant held the property in trust for the plaintiff.

■ A broken promise by itself is not a sufficient ground for enforcing a constructive trust.[6] However, where there has been either fraud or an unjust enrichment at the plaintiff's expense, a constructive trust will be imposed.[7] According to Corbin on Contracts:

> "If the defendant contracted to buy land with his own money, and later to convey it to the plaintiff, as long as the plaintiff has not paid the price, or otherwise performed to the enrichment of the defendant, there is no basis for a constructive trust."[8]

However, in the case presently before the Court, the plaintiff not only paid more than the down payment price to the defendant, but the defendant was also unjustly enriched by having the plaintiff pay for the repairs to the property. Defendant also was unjustly enriched when he deposited the money given to him by plaintiff in his personal account. Defendant, in addition, retained the property at 317 Crittenden Street and did not turn it over to the plaintiff for whom he held it in trust.

■ A constructive trust can be established by oral evidence.[9] In this instance we not only have oral evidence adduced at trial but written documentation that defendant assigned his property rights to the plaintiff. The underlying theory behind a constructive trust is that:

"(i)t could not be endured that a promisor should be permitted to hide behind a statute and reap the benefits of his chicane and fraud, or, even in the absence of any fraud, to hide behind the statute and enjoy the benefits of the other party's performance while repudiating his own duty. His repudiation may be a part of an antecedently laid plan to defraud the other party, or it may be merely an afterthought by which he may retain something for nothing. In either case, no system purporting to be a system of justice can fail to require restitution, either specific or in a money equivalent, unless it goes farther and enforces the defendant's express promise itself. Court of equity used the device of a constructive trust, generally to compel such restitution, but sometimes to enforce the express promise of the defendant." [10]

Based on the evidence adduced at trial, the Court finds that defendant not only defrauded the plaintiff, but he was also unjustly enriched by his behavior at plaintiff's expense. The Court therefore finds that under the theory of constructive trust, the property at 317 Crittenden Street was held by Loumis Taylor in trust for Lillian Williams.

### IV. Specific Performance.

■ It is usually a combination of factors that leads a court to order specific performance. Difficulty in determining damages, difficulty in the collection of those damages and the inability to obtain the substantial equivalent with that money are all factors to be weighed when a court decides whether to order specific performance.[11] After a careful weighing of the above factors, the Court orders that the defendant, Loumis Taylor, specifically perform his contract with Lillian Williams; that is, defendant is required to turn the property at 317 Crittenden Street, N.W., over to the plaintiff Lillian Williams.

---

**6.** 2 Corbin on Contracts § 401 at p. 373 & n.20 (1950).

**7.** Id. at p. 373.

**8.** Id., & n.41.

**9.** Id. at p. 372.

**10.** Id.

**11.** 5A Corbin on Contracts § 1142 at p. 117.

The Court directs specific performance of the contract for a variety of reasons. First, land is unique. Therefore, if money damages were awarded, plaintiff could not purchase the substantial equivalent of the property.[12] Second, damages would be hard to ascertain. Factors such as how much money was actually paid to defendant by plaintiff would have to be considered. However, defendant has lost all receipts pertaining to the repair bills. While plaintiff has presented evidence as to the amount she gave to defendant for "repairs," there is no way of determining how much of this money was in fact used for repairs. Also, factors such as the additional taxes plaintiff paid (as she was not able to claim this property as a deduction) would have to be considered. The Court would have to ascertain the tax benefits received by the defendant in this matter. Other factors such as attorney's fees, unpaid time away from work spent to pursue this matter, and potentially a variety of other factors would have to be established.

The Court must also consider in determining whether to order specific performance, that the defendant is involved in a bankruptcy proceeding. While it is true that the fact that plaintiff will have difficulty in collecting on the damages does not in and of itself show that the damage remedy is not adequate, the fact that plaintiff's prospective injury will greatly exceed the defendant's available assets ought to be and has actually been given great weight in determining the question of adequacy of the remedy in damages.[13]

### V. In addition to specific performance, damages will be awarded.

■ General equitable principles provide that a party should be made whole. A court of equity will also not, as a general rule, enter a partial or incomplete decree.[14] Rather, the court will strive to award relief which is complete and will dispose of the litigation so as to accomplish full justice.[15] It is also well established that once a court has acquired jurisdiction over a case, that court will retain that jurisdiction and grant full relief, both legal and equitable, as long as it pertains to the same transaction.[16] This general principle is also applied to actions for specific performance.[17] A court of equity may, pursuant to this power, award damages or compensation either independently or in addition to a decree of specific performance.[18] It may, and should do, what is equitable under the circumstances as presented to the Court through the evidence.[19] Based on these equitable principles, the Court will, in addition to decreeing specific performance of the contract, award to the plaintiff money damages of $7,000. This amount represents the difference between the down payment price of $5,000 (see Plaintiff's Exhibit No. 13) which Loumis Taylor paid to National Savings and Trust Company who was acting as a trustee for Fanny Rosen and the $12,000 (see Plaintiff's Exhibits Nos. 5, 6, 8), which plaintiff Lillian Williams paid to Loumis Taylor for her down payment.

### VI. Plaintiff's rights are subject to the Trustee's rights and the rights of the secured creditor.

■ Section 544(a)(3) provides that "a trustee shall have . . . the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by . . . a bona fide purchaser of real property from the

---

12. "A specific tract of land is *always* unique—a fact that has decisive influence in establishing the rule that specific performance of a contract for the sale of land will be granted." *Id.* at p. 123.

13. *Id.* at p. 122, & § 1156.

14. 27 Am.Jur.2d, Equity § 108 at p. 629.

15. *Id.* at p. 630.

16. *Id.* at p. 631.

17. 71 Am.Jur.2d, Specific Perf. § 210 at p. 268.

18. *Id.* at p. 268–69.

19. *Id.* at p. 269.

debtor." The legislative history indicates that this statutory section enables the trustee to have the status of a creditor who extended credit immediately prior to the commencement of a case.[20] Thus, plaintiff's rights are subject not only to the rights of Virginia Mortgage Bank as a secured creditor, but are also subject to the statutory rights provided the Trustee under the Code.[21]

However, the record at the time reflects that the Trustee has elected to abandon under § 554 of the Code any such rights which might have existed based on the apparent lack of equity in the property.[22]

*VII. Full relief requires an accounting of the rents and profits on the 317 Crittenden Street property.*

A court may order an accounting for rents and profits incident to enforcing a contract for the sale of land when it is necessary to attain the ends of justice.[23] Since the defendant has been found to have held the property in trust for the plaintiff, the Court finds an accounting to be necessary. The Court, therefore, orders that the defendant, Loumis Taylor, make a written accounting to the Court, with a copy to be served on the plaintiff's attorney, no later than thirty (30) days from the date of this order.

---

**20.** 124 Con.Rec.H 11,097 (Sept. 28, 1978); S 17,413 (Oct. 6, 1978).

**21.** See *Osin v. Johnson*, 100 U.S.App.D.C. 230, 243 F.2d 653 (1957).

**22.** The appraisal of the subject real estate reflects a fair market value of only $52,000. The encumbrance securing Virginia Mortgage Bank is in the amount of $51,281.66 and the resulting margin of equity is insufficient to justify further legal action on the part of the Trustee.

**23.** 71 Am.Jur.2d, *Specific Performance* § 210 at p. 269.