**In re Joyce Margaret VISSERS, a/k/a Joyce Hein Vissers, Debtor.**

**BUTLER MANUFACTURING COMPANY, INC., Plaintiff,**

v.

**Joyce Hein VISSERS, Defendant.**

**Bankruptcy No. 81–02393.
Adv. No. 81–0995.**

United States Bankruptcy Court,
E. D. Wisconsin.

July 14, 1982.

Paul Swanson, Oshkosh, for plaintiff.

Charles D. Koehler, Appleton, for defendant.

## DECISION

JAMES E. SHAPIRO, Bankruptcy Judge.

Plaintiff, a manufacturer of "Jamesway" farm equipment, commenced this action to declare its claim against defendant nondischargeable pursuant to § 523(a)(2)(A) of the Code, which states:

**17.** *See American Surety Co. v. Bethlehem National Bank*, 314 U.S. 314, 317, 62 S.Ct. 226, 228, 86 L.Ed. 241 (1941).

"A discharge under Section 727... of this title does not discharge an individual debtor from any debt...

(2) for obtaining money, property, services, or an extension, renewal or finance of credit, by...

(A) false pretenses, false representation or actual fraud..."

On November 8, 1978, defendant signed as a guarantor on behalf of her son, Douglas Hein ("Douglas") as consideration for plaintiff's selling its line of Jamesway products on open account to Douglas as a Jamesway dealer. Thereafter, Douglas filed a petition in bankruptcy on February 15, 1980. Before filing, however, Douglas had incurred an unpaid obligation to the plaintiff for merchandise sold. After the filing of Douglas' petition in bankruptcy, plaintiff commenced a state court action against the defendant, on the basis of the guaranty, for $18,727.75. This amount was disputed by defendant who claimed that the limit of her guaranty was $5,000.00. On the date scheduled for trial, July 10, 1981, (hereinafter referred to simply as "July 10"), the parties and their respective attorneys entered into an oral stipulation (later reduced to writing) wherein defendant agreed to pay to plaintiff the sum of $10,000.00 within 30 days from July 10, and, if she failed to do so, to consent to a default judgment against her in the sum of $18,200.00.

Thereafter, the following flurry of activity occurred:

1. On July 21, 1981, a $20,000.00 note with a balance of $18,000.00 due to defendant from Hein Construction and Supply, Inc.[1] was prepaid to defendant, at a discount, for $15,000.00.

2. On July 28, 1981, defendant signed an offer to purchase a home located at 2500 East College Avenue, Appleton, Wisconsin, for $59,900.00. $13,500.00 of the $15,000.00 which she had received from Hein Construction and Supply, Inc. in payment of the note was used as the downpayment on this home; the balance was to be paid in accordance with a land contract.

3. On July 31, 1981, the real estate closing for the purchase of the College Avenue residence took place, and the land contract was thereafter recorded on August 4, 1981.

4. On August 7, 1981, defendant filed a voluntary petition in bankruptcy.

Plaintiff commenced this action, alleging that the debt due to it in the sum of $21,080.72[2] is nondischargeable, based upon a fraudulent scheme perpetrated by the defendant upon plaintiff.

The elements of fraud required to be established by the plaintiff under § 523(a)(2)(A) have been well enunciated in many cases. In order to prevail, plaintiff must prove all of the following elements:

1. That the debtor made the representations;

2. That at the time made, debtor knew they were false;

3. That the representations were made with the intention and purpose of deceiving the creditor;

4. That the creditor relied on such representations; and

5. That the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.

*In re Stewart*, 10 B.R. 214 (C.D.Calif.1981); *Matter of Nelson*, 561 F.2d 1342 (9th Cir. 1977); *In re Harlan*, 7 B.R. 82 (Bkrtcy.D. Ariz.1980); *In re Dolnik*, 374 F.Supp. 84 (N.D.Ill.1974); *Sweet v. Ritter*, 263 F. Supp. 540 (W.D.Va.1967). The standard of proof required in order to establish fraud is clear and convincing evidence. *3 Collier*

---

1. At this particular time the company was owned by defendant's two other sons and a daughter, namely, Dennis, Fred and Vicki. Douglas, who at one time held an ownership interest in this company, no longer retained any interest.

2. This sum consisted of $18,280.72 in accordance with an exhibit admitted into evidence setting forth this balance, together with an additional $2,800.00 which plaintiff was required to pay to the trustee in bankruptcy for Douglas in settlement of a preference action.

*on Bankruptcy*, § 523.11 (15th Ed.); *Ma v. Community Bank*, 494 F.Supp. 252 (E.D. Wis.1980); *In re Peterson*, No. 76–621 (E.D. Wis. May 4, 1977); *In re Gibson*, No. 74–1565 (E.D.Wis., March 10, 1975). A companion to the application of the burden of clear and convincing proof is a well settled principle of bankruptcy courts that exceptions to discharge are to be construed strictly against a creditor's objection and liberally in favor of the debtor. *Gleason v. Thaw*, 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915).

It is at this point appropriate for this Court to apply these legal principles to the facts before it. The purported fraudulent conduct on the part of the defendant consisted of entering into a settlement with the plaintiff on July 10, followed shortly thereafter by a series of events initiated by the defendant and which culminated in the filing of a petition in bankruptcy by her on August 7, 1981. This Court is asked to determine if the defendant really intended to make a good faith effort to pay the $10,000.00 within the thirty day period from July 10 or if she merely entered into the mechanics of an agreement as a "stall tactic" in order to buy time to enable her to convert a nonexempt asset into an exempt homestead and thereafter file bankruptcy. Plaintiff asserts that it was the latter of the two alternatives which was in the defendant's mind when she entered into the settlement and that the debt arising out of the defendant's guaranty is therefore not dischargeable, based upon fraud.

■ The fraud necessary to make a debt nondischargeable must exist at the inception of the debt. 2 *Collier Bankruptcy Manual* (3rd Ed.) § 523.03. This Court construes the words "inception of the debt", when applied to the facts before it, as occurring either on November 8, 1978, when the defendant signed the guaranty on behalf of her son Douglas, or during the period of time the plaintiff sold merchandise to Douglas and for which payment was never received.[3] Regardless of which time may

apply, there is no evidence in the record which suggests that the defendant had any fraudulent intent during any of these particular times. The earliest point in time in which there is any indication of a fraudulent intent on the part of the defendant was July 10, 1981. Of necessity, in order for the plaintiff to prevail, there must be a finding that the "inception of the debt" was July 10, 1981. This Court has difficulty in accepting the concept that the debt ripened on July 10 because by this time the defendant was already obligated to the plaintiff. The July 10 settlement simply provided a method of payment of a preexisting obligation and offered the defendant a substantial discount if she paid in cash within thirty days. No new consideration was provided by the plaintiff on July 10, other than a possible forebearance on its part from obtaining and then executing on a default judgment for a period of thirty days.

Even if plaintiff is correct in maintaining that the debt came into existence on July 10, because of this forebearance, the establishment of a fraudulent intent on the part of the defendant still is unclear on the basis of the testimony presented. All evidence presented was circumstantial in this regard. Without question, the key witness on this issue was the defendant herself. Her business background was limited. Her first husband had been in the business of selling farm equipment which he ran with the assistance of the Hein children. After his death approximately seven years ago, the children continued to operate the business. Defendant's role in this operation was confined to occasionally driving a truck and answering business telephone calls. She also worked as a school bus driver and later as a cook at Lawrence University. Other than that, she was a housewife raising a family.

Defendant admitted that she had thought about bankruptcy prior to July 10 and had discussed this possibility with her first attorney. However, she steadfastly denied that on July 10 she was "specifically con-

**3.** From the exhibits and testimony, it appears that the period when merchandise was sold from plaintiff to defendant was from December 1979 to November or December, 1980.

templating bankruptcy" and stated "that day, bankruptcy did not cross my mind. I was more interested in what was going to happen in that hearing." She stated that her ultimate decision to file for bankruptcy was finally made in the first week in August, 1981. She stated that if she had the $10,000.00 with her on July 10, she would have paid it; but when she ultimately did receive the proceeds eleven days later, her decision not to pay was made "upon advice of my attorney." She denied that, on July 10, she had any scheme or plan to trick plaintiff.

After assessing the credibility of the defendant, this Court believes that she was a truthful witness who mistakenly believed she had signed a guaranty on behalf of her son Douglas limited to $5,000.00. After Douglas filed for bankruptcy and suit was commenced against her, at the time of trial on July 10 she entered into a stipulation with the intention at that particular point in time to comply. Thereafter—precisely when is not known, but at some point subsequent to July 10—she changed her mind and upon legal advice, put into motion the previously described sequence of events.

This Court has analyzed *Stoner v. Walsh*, 24 Cal.App.3d 938, 101 Cal.Rptr. 485 (1972), a case relied upon by plaintiff in support of its position. To some degree there is a similarity of facts to those in the instant case. *Stoner* involved a stipulated judgment and an agreement by the defendant to make fixed payments over a fixed period of time, with the execution of judgment being stayed pending payment of the agreed upon installments. Thirteen days after entering into this agreement, the defendant, without making any payments to the plaintiff, filed a petition in bankruptcy. The court held that the debtor's fraud barred the discharge of the debt in bankruptcy. The Court also stated that by making this false promise, the defendant not only obtained a valuable property right (consisting of relinquishment by the plaintiff of a right to attachment against debtor's real estate) but also an extension of

credit through the stipulated stay of execution on the judgment. The cases do differ in several important respects: In *Stoner* (unlike the instant case), defendant testified several times that he never intended to pay when he entered into the stipulation. Furthermore, in the case at bar, there was no underlying fraud by which plaintiff was induced to forego lien rights in defendant's real estate in reliance upon the settlement.[4] Defendant did not own any real estate on July 10. A third point which distinguishes *Stoner* from this case is that in *Stoner*, the debtor's exempt homestead was purchased with money fraudulently obtained by the debtor from the plaintiff.

Other cases which the plaintiff has cited are *In re Black*, 373 F.Supp. 105 (E.D.Wis. 1974) and *In re Schnore*, 13 B.R. 249 (W.D. Wis.1981). Both are clearly distinguishable. In each case, the fraud on the part of the debtor occurred at the particular time when the debtor received certain property purchased on credit. The Court in the *Schnore* case pointed out, 13 B.R. at 255:

"This intent not to repay must be present at the time the goods are purchased, and a debt will be discharged if the creditors cannot show that the bad intent existed at the time of purchase even though the debtor subsequently decided not to repay the debt."

Up to this point, the discussion has focused upon the existence or nonexistence of a fraudulent intent by the defendant at the inception of the debt. As previously stated, there are other necessary elements of fraud which must also be proven before the plaintiff can prevail. The Court is not persuaded by clear and convincing proof, that there was reliance on the part of the plaintiff to its detriment or that the plaintiff suffered any loss as a result of having entered into the July 10 settlement for a previously incurred obligation. In the case of *In re Keck*, 3 B.R. 517 (E.D.Tenn.1980), a false financial statement was not provided to a bank by the debtor until approximately six or seven weeks after the loan. The Bankruptcy Court held that the financial

---

**4.** This distinction was also noted in *In re Kri-*   *ger*, 2 B.R. 19, 22 (D.Or.1979).

statement could not have been relied upon by the bank since it was not in existence when the loan was made. A similar situation presents itself in the case at bar. The settlement merely provided the defendant with an alternative to paying the full amount which was already due if defendant was able to pay the lesser sum of $10,000.00 in cash within thirty days. All that plaintiff did, by entering into this settlement, was to defer the entry of a judgment for thirty days. The fact that plaintiff reserved to itself the right to entry of a judgment for the full amount being sought if the lesser sum of $10,000.00 was not paid within thirty days is a signal that plaintiff did not fully expect to be paid and attempted to protect itself against that possibility.

There is another indication in the record of a lack of reliance by plaintiff upon defendant's actions in agreeing to the July 10, 1981 settlement. The stipulated facts filed by the parties state that as early as May 7, 1981, plaintiff was aware that defendant was contemplating filing for bankruptcy, although plaintiff also wrongly assumed (because it was also aware that defendant had a note receivable due to her for $18,000.00) that even if she filed a bankruptcy petition, there would be a dividend. Plaintiff reached this conclusion because it was the major creditor and because the $18,000.00 note would be, for the most part, nonexempt. What plaintiff did not consider was the possibility of defendant's conversion of this note into a fully exempt asset before filing for bankruptcy.

In this Court's view, plaintiff probably placed itself in no worse a position when it entered into the stipulation on July 10 (which required plaintiff to wait thirty days before obtaining a judgment) than it would have been had it obtained a judgment on July 10. This is perhaps what most sharply distinguishes In re Baldwin, 578 F.2d 293 (10th Cir. 1978), another case cited by plaintiff in its trial brief, from the instant case. In Baldwin, the defendant had filed a peti-

tion in bankruptcy three years before he entered into a settlement in court arising out of an action based on negligent medical treatment, which obligated him to make payments to the plaintiff over a period of time. Under the payment schedule, it provided for defendant to pay less than one-fifth of the settlement amount during the period in which defendant was ineligible to again file for bankruptcy. As soon as the defendant became eligible to file for bankruptcy, he did so promptly, with approximately four-fifths of the settlement amount still unpaid. The Court in that case held that the debt was nondischargeable.[5] It is recognized that had the plaintiff obtained a judgment, instead of agreeing to a payment schedule which provided for minimal payments during the period defendant was ineligible to file for bankruptcy, plaintiff could have collected the debt or at least had ample time, consisting of three years, to try to collect. In the instant case, there was no similar settlement agreement. Plaintiff was delayed from obtaining judgment for only thirty days. It is speculative at best as to whether or not plaintiff could, under these circumstances and after taking into account the time needed to enter a judgment and then enforce it by post judgment remedies, have collected its obligation or prevented the defendant from converting a non-exempt asset into an exempt homestead. In any event, it is a moot point because of this Court's finding of insufficient proof of fraudulent intent by the defendant at the inception of the debt.

Finally, this Court observes that plaintiff is critical of defendant's actions in converting the note receivable which was due her into an exempt homestead. There is nothing improper in doing this, and such action by a debtor on the eve of bankruptcy is approved. See, House of Representatives Committee on the Judiciary. Report No. 95–595, 95th Cong., 1st Sess. 360–1 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787, 6317.

**5.** In Baldwin, the court also specifically made a finding that the settlement agreement was induced by the defendant's false representations.

This is another factor which differentiates it from the case at bar.

"As under current law, the debtor will be permitted to convert nonexempted property into exempt property before filing a bankruptcy petition. *See, Hearings*, pt. 3, at 1355–58. The practice is not fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law."

It is for these reasons that this Court concludes that all of the requisite elements of fraud have not been proven by clear and convincing proof and that the debt due from the defendant to the plaintiff is not excepted from discharge.

This decision shall stand as and for findings of fact and conclusions of law, pursuant to Bankruptcy Rule 752.