In the Matter of Peter CICERO and Cynthia Cicero, Debtors.

Jeffrey GRAMZA and Patricia Gramza, his wife, Plaintiffs,

v.

Peter CICERO and Cynthia Cicero, his wife, Defendants.

Bankruptcy No. 81–00996.
Adv. No. 81–0705.

United States Bankruptcy Court, E.D. Wisconsin.

March 8, 1983.

Michael Flaherty, Franks & Pikofsky, S.C., Milwaukee, Wis., for plaintiffs.

Roger Lambert, Milwaukee, Wis., for defendants.

## DECISION

JAMES E. SHAPIRO, Bankruptcy Judge.

Jeffrey and Patricia Gramza ("Plaintiffs") commenced an action against debtors Peter and Cynthia Cicero ("Defendants") to declare an alleged debt of debtors nondischargeable pursuant to § 523(a)(2)(A) of the Bankruptcy Code which states:

"A discharge under section 727 ___ of this title does not discharge an individual debtor from any debt ___

(2) for obtaining money, property, services or an extension renewal or finance of credit, by ___

(A) False pretenses, false representations or actual fraud ___" [1]

A substantial portion of the facts are not in dispute. In the early afternoon of July 2, 1978, plaintiffs, responding to a newspaper advertisement of a house being offered for sale, attended an open house at 2278 West Plainfield Avenue, Milwaukee, Wisconsin. The home was owned at that time by defendants who had retained a realtor, Relocation Realty Company ("Relocation"), to procure a purchaser. After touring the premises, plaintiffs left, but, being interested, returned approximately one and a half hours later, this time accompanied by Mrs. Gramza's sister and brother-in-law, Mary and Frank Griffin. On each occasion, plaintiffs viewed the basement area for about ten minutes, both times in the presence of Diane Ziegenhagen, a sales agent for Relocation. From the testimony, nothing unusual was observed by the plaintiffs on either occasion; more specifically, plaintiffs did not observe water on the floor or entering the basement from any point on any wall. In the morning of July 2, there had been a steady rainfall which tapered off to a mist or slight drizzle when the plaintiffs first arrived at the home. Defendants stated that water was visible in the basement during the inspections, but this was directly contradicted by plaintiffs. It was also disputed whether or not Ms. Ziegenhagen had specifically pointed out the location or locations in the east basement wall which leaked. All parties acknowledged that the basement lights had been turned on during the inspections, and there was no contention of the basement area being dimly lit.

A property data sheet prepared by Relocation and presented to all prospective purchasers contained the following language:

"Buyer to be made aware of slight leak in east wall after heavy rains."

Defendants claimed that they never authorized the use of the words "after heavy rains" and never saw this data sheet until the time of trial.

Following their second inspection on July 2, plaintiffs decided to purchase the home and signed an offer to purchase for $47,900 prepared by Ms. Ziegenhagen and which specifically recited:

"Buyer aware of slight leak in basement east wall". Plaintiffs acknowledged that they read this provision before signing, but added they considered it to be a matter of little concern to them because of the verbal representation by Ms. Ziegenhagen that it was only a slight leak which occurred during heavy rains. The offer to purchase was accepted by defendants on July 3, 1978 and the closing occurred on July 31, 1978, the first time that plaintiffs and defendants met and directly spoke to each other.

In early August of 1978, plaintiffs moved into their newly purchased home. Approximately one and one half months later, they began to notice certain problems in the basement, particularly in the east wall of the basement where puddles of water formed and flowed into the basement drain when it rained. Plaintiffs said this happened not only after heavy rains, but after all types of rainfalls. According to the testimony of plaintiffs, in the fall of 1978, on at least one occasion after a rainfall, approximately one inch of water accumulated, requiring plaintiffs to put on boots and sweep the water into a drain. Leaks were observed by plaintiffs in several locations on the east wall, all approximately six inches above the floor surface at the mortar joint between the first and second courses. Plaintiffs stated this was the major source of the problem, but added that cracks were also present in the north and south basement walls. Plaintiffs further noticed chipped paint and chipped mortar on the basement floor. Defendants denied the ex-

---

1. By stipulation, this trial was conducted as a bifurcated trial for the purpose of initially determining the issue of dischargeability of the debt; the parties agreed that if the Court finds the debt nondischargeable, then the issue of damages shall be decided by a jury.

istence of any leaks in the basement, except in the east wall.

Everyone acknowledged that the Winter of 1978 was extremely severe and produced heavy snowfalls. In late February and March of 1979, when thawing occurred, a considerable amount of water entered the basement through openings in the east wall and accumulated. As had previously occurred in the Fall of 1978, plaintiffs once again put on boots and swept the water into the basement drain.

In the Spring of 1979, plaintiffs contacted two foundation repair companies (Continental Contractors, Inc. and McCoy Waterproofing) and received written estimates from each company. They decided to hire McCoy Waterproofing to brace up the east wall and perform extensive basement repairs, including excavation, waterproofing, straightening and enforcing the basement walls and installing new drain tiles and a new sump pump, at a cost which exceeded $8,000.

Plaintiffs testified that after these repairs were made, no further water problems have occurred in the basement.

The testimony reveals that one week before defendants listed the home for sale, they had made arrangements to have the basement painted by William Hordyk, a 17 year old neighbor. The basement floor and the first course of the basement wall, including the mortar joint between the first and second courses, were painted a dark green color, and the rest of the walls were painted a lighter green color. William Hordyk testified he had been instructed by defendants to paint the basement in this manner, which defendants stated was exactly as it had been painted when they purchased the home in 1974.

Defendants strenuously denied encountering any serious water problems while living in this home. They also pointed out that they never even spoke to plaintiffs until the closing and that the statement in the offer to purchase ("buyer aware of slight leak in the basement east wall") was accurate. Plaintiffs further declared that if any serious water problems arose, they

were created after the home was sold to plaintiffs and caused by the unusual heavy snowfalls in the Winter of 1978 and eventual melting which followed.

## ELEMENTS OF FRAUD UNDER SECTION 523(a)(2)(A)

The elements of fraud required to be established within the meaning of § 523(a)(2)(A) of the Bankruptcy Code have been enunciated in many cases, including this Court's decision in *In re Vissers,* 21 B.R. 638 (Bkrtcy.E.D.Wis.1982) at 639:

"In order to prevail, plaintiff must prove all of the following elements:

(1) that the debtor made the representations;

(2) that at the time made, debtor knew they were false;

(3) that the representations were made with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations; and

(5) that the creditor sustained the alleged loss and damage as a proximate result of the representations having been made."

Each of these elements will herein be discussed within the context of the evidence presented.

## REPRESENTATIONS MADE BY DEFENDANTS

Both the offer to purchase and the listing contract were signed by defendants and then displayed to plaintiffs. Both contained the recitation of the existence of a "slight leak" in the east wall of the basement.

In addition to these written representations, there was a statement in the data sheet prepared by defendants' agent, Relocation, as well as a verbal representation made by Relocation's agent, Diane Ziegenhagen, on July 2 to the plaintiffs that a slight leak may occur during heavy rains. Defendants insisted that, while they authorized Relocation and its agents to notify prospective purchasers of the existence of a "slight leak", they did not authorize the

additional representation that this occurred "after heavy rains". However, whether or not the phrase "after heavy rains" was specifically sanctioned by defendants is immaterial. This is because the use of the words "slight leak" which defendants acknowledged having authorized Relocation and its agents to make, was in and of itself a major misrepresentation of fact (as is discussed more fully hereafter in this decision under the following subsection.)

## KNOWLEDGE BY DEFENDANTS THAT STATEMENTS WERE FALSE

This second element of the five part test for nondischargeability of a debt based upon fraud was emphasized by both parties in great length throughout the trial. Within this element is the need for the Court to initially determine if defendants' representation of a "slight leak" was false and also if defendants knew it to be false. Both inquiries are answered by this Court in the affirmative.

Various witnesses were questioned as to their understanding of a "slight leak". Each provided a different definition.[2] This Court is satisfied that, as of July 2, 1982, both defendants knew that more than a slight leak existed in the basement of the Plainfield Avenue home. The following evidence in the record amply supports this finding:

1. Almost immediately after defendants purchased the Plainfield Avenue home in 1974, they became aware of water problems originating in the east basement wall. This condition persisted throughout the entire period of time that they occupied this home.

2. This condition was serious enough to cause defendants in September of 1975 to contact Maier Construction Company, a firm engaged in the repair of basement foundation walls. This company supplied a written estimate for approximately $2,900 which included excavation, waterproofing, shoring, resetting drain tile, backfilling of walls and removal and installation of concrete blocks. Defendants rejected this estimate and opted for less costly measures which they hoped would solve the problem but which measures failed.

3. Ben Olson, a consulting engineer specializing in basement foundation analysis, testified as an expert on behalf of plaintiffs. His examination of the Plainfield Avenue Home in March of 1979 produced findings that the east wall was bowed and leaning inward, was sheared horizontally at the first horizontal joint above the floor and was cracked both horizontally and diagonally. This led Mr. Olson to conclude that the east wall was not structurally sound and that the water problem existed for "many years"—at least four or five years and possibly as long as fifteen year prior to his examination. It was his opinion that only extensive repairs (requiring excavation, removal and rebuilding of the east wall and straightening of the other walls) could rectify this condition. The only expert testimony presented on behalf of the defendants came from George Prokop who had regraded the defendants' yard in 1975 for the purpose of improving the drainage away from the north side of the house and also for "cosmetic purposes". Mr. Prokop further testified that his specialty was limited to grading and that he never inspected the basement of this particular home.

4. William Hordyk, testifying for defendants, stated that while he was painting the basement, it had rained, causing leaks to be formed in the east wall at the mortar joint between the

---

**2.** Peter Cicero said drops of water trickling down the wall sometimes forming a slight stream and sometimes causing puddles but not "with the force of a garden hose or a fire hose" created a slight leak. Cynthia Cicero stated "my definition of 'slight' is something that I can live with". Jeffrey Gramza testified that "slight" meant "a couple of drops". Patricia Gramza stated "any type of accumulation of water is more than a slight leak". William Hordyk stated "any water coming through a wall I would consider more than a slight leak".

first and second courses. He also testified that while painting, he felt a bump, indicating to him a shearing at the mortar joint between the first and second courses. He also observed a bowing of the east wall.

5. Cynthia Cicero and Diane Ziegenhagen[3] each testified that on several occasions before the home had been listed for sale, they had discussed the existing basement water problems.

Piecing together these particles of evidence convinces this Court that both defendants were fully cognizant of the existence of a serious water problem in the basement of this home.

### REPRESENTATIONS MADE WITH INTENT AND PURPOSE OF DECEIVING PLAINTIFFS

It is of course extremely difficult for the Court to probe into the inner processes of the minds of the defendants in order to ascertain their intent. However, courts may infer such intent from the totality of the circumstances. As stated in *In re Schlickmann,* 6 B.R. 281, 282 (Bkrtcy.D. Mass.1980):

> "Direct proof of fraudulent intent is rarely available. Therefore, intent to deceive may be inferred when the totality of the circumstances presents a picture of deceptive conduct by the debtor, which indicates that he did intend to deceive and cheat the lender. The representation coupled with his conduct is sufficient to permit the court to infer the requisite intent."

Judge Clive W. Bare in the case of *In re Holcombe,* 23 B.R. 590 (Bkrtcy.E.D.Tenn. 1982) reaffirmed this principle by stating that although fraud is never presumed and when used in the context of excepting a debt from discharge, means "positive fraud involving moral turpitude", it may be implied if the totality of the circumstances so requires. Judge Bare stated, *In re Holcombe,* at page 593:

> "The cases are legion which point out that the purpose of bankruptcy legisla-

tion is to relieve the honest debtor from financial difficulties not to provide a shield for the dishonest".

The evidence presented at the trial persuades this Court that defendants knew of the defective condition of the basement and intended to deceive plaintiffs for the purpose of consummating a sale. In addition to the written and verbal representations recited herein, the manner in which defendants had their home painted immediately before it was offered for sale evinced a conscious attempt to conceal the facts from prospective purchasers, regardless of whether or not they, or previous owners of the property, had patched up the cracks. In Wisconsin (in an action based upon intentional misrepresentation) while a seller has no duty to disclose information to the buyer, the following recognized exceptions exist:

1. Where the seller actively conceals a defect; and

2. Where the seller has told a "half truth" or made an ambiguous statement if the seller's intention is to create a false impression.

*Ollerman v. O'Rourke Co., Inc.,* 94 Wis.2d 17, 288 N.W.2d 95 (1980); *see also, Kanack v. Kremski,* 96 Wis.2d 426, 291 N.W.2d 864 (1980). Both exceptions exist in the instant case. Because of these exceptions, defendants had a duty to fully disclose, but failed to do so.

In order to determine defendants' intention, it is appropriate to scrutinize their experience and background. They are by no means unsophisticated individuals. Mr. Cicero has been a salesman for more than ten years, primarily engaged in the sale of automobiles. He has owned and operated his own used car lot. As a licensed car salesman subject to State regulations, he was keenly sensitive to the consequences of any misrepresentations made by car salesmen and the requirement for candid and full disclosures. Mrs. Cicero was also aware of the consequences of any misrepresentations involved in the sale of this home,

---

**3.** The testimony reveals that they were personal friends.

having attended a real estate course at Milwaukee Area Technical College in the Fall of 1977, shortly prior to the sale. She testified that a substantial amount of time in this course was devoted to consequences of any misrepresentations made in the sale of homes. The *Wisconsin Real Estate Law Manual,* prepared by the Wisconsin Real Estate Examining Board, and furnished to Mrs. Cicero as the source material for her class, emphasizes in great detail the consequences of misrepresentations on the part of the seller.

Defendants cannot gloss over these representations made either directly by them or on their behalf as constituting mere opinion or puffing.

> "Undoubtedly, even today the agent has a legal privilege to do a bit of puffing, but the extent of his privilege is narrowing, and it is narrowing to an almost nonexistent margin where the prospect is a person of little business experience who can be expected to believe the puffing without applying the proverbial pinch of salt that an experienced buyer would apply."

*Wisconsin Real Estate Manual,* (1980). "The Broker's and Salesperson's Duty Not to Misrepresent," Section 3.03.

Representations about the present condition of a basement are markedly different from representations regarding future performance capabilities, as were present in the case of *J.H. Clark, Co. v. Rice,* 127 Wis. 451, 106 N.W. 231 (1906) cited by defendants in their brief. In addition, the *Clark* decision pointed out that it is for the trier of fact to determine whether or not a representation constitutes a statement of fact or opinion. This Court, as the trier of fact, determines that the representation of the existence of a "slight leak" in the basement was more than a mere expression of opinion. It constituted a statement of fact.

## RELIANCE BY PLAINTIFFS

It is implicit under Section 523(a)(2)(A) for this Court to find not only "reliance" but that such "reliance" was reasonable. The same analysis as was done with the defendants—namely, an examination of the experience and background of plaintiffs—is appropriate. Plaintiffs testified that this was their first venture in the purchasing of a home. Plaintiff Jeffrey Gramza, 24 years old at the time of the purchase, was a factory worker. His wife, Patricia Gramza, also 24 years old, was a supervisor for an insurance company. Neither had ever been involved in any real estate matters. Both completely depended upon the experience and integrity of Relocation and stated that this was the reason no further inquiry was made regarding the condition in the basement. Their actions in looking to relatives for guidance because "they were home owners", rather than seeking out the opinion of a contractor, mason, or waterproofing specialist, only serve to emphasize their degree of naivete.

Defendants have advanced the argument that, because plaintiffs had ample opportunity to examine the property and bring in their own independent experts but failed to do so, they are now precluded from any recovery. This argument is aimed at establishing a lack of reasonable reliance by plaintiffs. Each of the cases cited by defendants in support of this contention[4] is distinguishable. Most of the cases cited involved alleged misrepresentations by sellers pertaining to the value of property which was in full view of buyers who, through ordinary observation, could determine whether or not such representations were true. The *Ashley* case involved a leaky boat. There was a full disclosure by the debtor-seller to the buyer of the problem, and a spot which caused the problem and had been patched was specifically pointed out to the buyer who admitted seeing it. Furthermore, there were no attempts by the debtor-seller to conceal this spot. The *Hobbs* case holds that a buyer may not "blindly" act in reliance of a state-

---

4. *O'Day v. Meyers,* 147 Wis. 549, 133 N.W. 605 (1911); *O.L. Packard Machinery Co. v. Schweiger,* 147 Wis. 67, 132 N.W. 606 (1911); *W.H. Hobbs Supply Co. v. Ernst,* 270 Wis. 166, 70 N.W.2d 615 (1965); *In re Ashley,* 5 B.R. 262, 6 B.C.D. 655 (Bkrtcy.E.D.Tenn.1980).

ment where the exercise of ordinary attention by the buyer could have ascertained its truth or falsity. In the case at bar, this Court is satisfied that the plaintiffs did not act "blindly" and could not have ascertained, through the exercise of ordinary attention, whether or not the basement leaks were "slight". Although it would have been prudent for the buyers to have retained an independent expert before purchasing the home, there was no obligation to do so.

### PROXIMATE CAUSE

The final element to be considered is whether or not the loss directly resulted from defendants' actions. Efforts have been made by defendants to prove that even if a water problem existed, it arose after July 2, 1978 and resulted from subsequent massive snow storms and eventual thawing for which they cannot be held responsible. This Court accepts as a fact that the Winter of 1978 was bitter and produced unusual snow falls, even for Wisconsin. Nevertheless, this Court also accepts as a fact that in the preceding Fall, on at least one occasion the basement area flooded to a depth of approximately one inch. Furthermore, the conclusion by Mr. Olson of the existence of a long-standing problem in this basement area prior to the 1978 Winter is significant. These factors, together with the other factors noted (particularly in the discussion of the second element dealing with defendants' knowledge that the statements were false) leads this Court to conclude that plaintiffs' loss was a proximate result of misrepresentations made by defendants, Relocation and Ms. Ziegenhagen.

### CONCLUSION

Plaintiffs were required to establish the burden of proof on all five elements in order to prevail under § 523(a)(2)(A). The Court finds that they have done so by clear and convincing evidence.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the debt of the defendants to the plaintiffs is nondischargeable. This decision shall stand as and for findings of fact and conclusions of law in accordance with Rule 752 of the Federal Rules of Bankruptcy Procedure.

The Court is mindful of the stipulation of the parties (referred to in Footnote 1 of this decision) that, in the event such a determination is reached, the issue of the damages shall then be decided by a jury. The Court believes that the parties are entitled to a jury determination on this issue. However, the Court is presently operating under a local Emergency Rule promulgated by the United States District Court for the Eastern District of Wisconsin in response to *Northern Pipeline Construction v. Marathon Pipe Line Co.,* —— U.S. ——, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). Pursuant to this Rule, this Bankruptcy Court is prohibited from conducting jury trials. Accordingly this Court certifies this case to the United States District Court for a jury trial on the issue of damages.